UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

AMBAR PRATT, F/K/A AMBAR
TORRES, AS ASSIGNEE OF MARISE S.
EASON,

       Plaintiff,

v.                                   Case No: 8:18-cv-1607-T-36AEP

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

       Defendant.
_____/

# **O R D E R**

This cause comes before the Court upon Defendant's Motion for Final Summary Judgment, (Doc. 35), and Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law, (Doc. 36). Both motions are ripe for the Court's review. (Docs. 40, 41, 43, 44, 86, 87). The Court, having considered the parties' submissions and being fully advised in the premises, will grant Defendant's Motion for Final Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.

## I.    BACKGROUND

### A. Undisputed Facts[1]

This action arises from a multiple-vehicle accident involving Ambar Pratt f/k/a Ambar Torres, as assignee of Marise S. Eason ("Plaintiff"). (Doc. 39 ¶1). On November 10, 2006, Marise S. Eason ("Eason"), while operating a vehicle, rear-ended another vehicle driven by Josh Hajipour, in which Plaintiff, Jessica Hajipour, and Jaclynne McCrary ("McCrary") were passengers. *Id.* As

---

[1] The Court has determined the undisputed facts based on the Joint Stipulation of Agreed Material Facts. (Doc. 39).

a result of this rear end collision, the vehicle in which Plaintiff was a passenger collided with another vehicle, which was driven by Michael Zapolski ("Zapolski"). This multiple-vehicle accident caused injuries or potential injures to many individuals, including Plaintiff, Zapolski, Josh Hajipour, Jessica Hajipour, Jason Ortiz, and Shane Richardson. *Id.* The accident also resulted in McCrary's death. *Id.*

At the time of the accident, Government Employees Insurance Company ("Defendant") insured Eason and his wife under an automobile liability insurance policy, policy number 4044-39-32-15 (the "Policy"), which provided bodily injury liability limits in the amount of $25,000 per person and $50,000 per occurrence. *Id.* at ¶2.

Nearly one month after the accident, on December 7, 2006, Eason reported the accident to Defendant for the first time. *Id.* at ¶3. On the same day as Eason's notification of the accident, Defendant began an investigation and assigned Leslie Sinclair ("Sinclair"), a claims examiner, to handle the claim. *Id.* at ¶4. On December 8, 2006, Sinclair obtained Eason's recorded statement as part of Defendant's investigation of the accident. *Id.* at ¶5. During his recorded statement, Eason claimed that he was driving a vehicle for his employer, Atlantic Tower Services ("ATS"), at the time of the accident, not the vehicle insured under the Policy. *Id.* Hartford Fire Insurance Company ("Hartford"), as ATS's insurer, hired attorney Teresa Jones ("Jones") to represent Eason and ATS. *Id.* at ¶6. When Sinclair contacted Jones on December 8, 2006, Jones advised that the accident had resulted in one fatality and several injured parties. *Id.* Jones also reported that Hartford had received a policy limits demand for $1 million on behalf of McCrary. *Id.*

Less than one week later, Sinclair obtained another recorded statement from Eason, in which he explained that he drove his co-worker's ATS vehicle during the night of the accident because the co-worker was too inebriated to drive. *Id.* at ¶7. Defendant decided to provide coverage

2

for the accident on December 14, 2006. *Id.* at ¶8. On the same day, Sinclair sent a certified letter to Eason, which: (1) set forth the available limits under the Policy; (2) advised that the claims arising from the accident would exceed the Policy's limits; (3) informed Eason of his right to seek legal counsel regarding any personal liability that may arise from the claims, as well as his right to contribute any personal funds to the settlement of the claims; (4) informed Eason of the claims being presented by Plaintiff, McCrary, Zapolski, Josh Hajipour, and Jessica Hajipour; and (5) advised that these claims against Eason could exceed Hartford's $1 million policy limits. *Id.* at ¶9. Also on December 14, 2006, attorney Joseph Kissane ("Kissane") notified Defendant that Hartford had received a second demand for the Hartford policy's limits from attorney Dominic Fariello ("Fariello"), who represented Plaintiff, Josh Hajipour, and Jessica Hajipour. *Id.* at ¶10. When Kissane advised Sinclair that he intended to schedule a global settlement conference to resolve the claims against ATS and Eason, Sinclair advised him of her desire for a representative of Defendant to be involved in any global settlement conference. *Id.*

On the next day, December 15, 2006, Defendant authorized settlement authority for the entire $50,000 bodily injury liability per occurrence limit and advised Jones that it was offering this amount to contribute towards the settlement of all the claims. *Id.* at ¶12. A few days later, on December 20, 2006, Fariello sent a time-sensitive demand letter to Defendant on behalf of Plaintiff, Josh Hajipour, and Jessica Hajipour. *Id.* at ¶13. In the letter, Fariello demanded the $50,000 per occurrence bodily injury policy limits within fifteen days of the date of the letter—January 4, 2007—to settle the injury claims of Plaintiff, Josh Hajipour, and Jessica Hajipour. *Id.* Fariello emphasized in the letter that he directed the demand to Defendant and its "insured Marise S. Eason alone and no other party." *Id.* (internal quotation marks omitted).

On December 21, 2006, Mark Sugden, Defendant's regional claims manager, recommended that Defendant refer the case to its staff counsel for representation of Eason and coordination of a global settlement conference to resolve the injury claims against Eason. *Id.* at ¶14. Jones also advised Defendant that Hartford had tendered its $1 million policy limits to McCrary's estate in exchange for a release of ATS and Eason, thereby exhausting Hartford's available policy limits. *Id.*

On December 26, 2006, Sinclair sent a letter to Eason, enclosing a copy of Fariello's demand letter, advising him that Defendant had retained counsel with the Law Office of James Pratt on Eason's behalf and that ATS had settled with McCrary's estate for the Hartford policy's $1 million limits. *Id.* at ¶16. Sinclair also requested that the retained counsel coordinate a global settlement conference to try to settle all claims. *Id.* Consequently, on the same day, attorney Cosmo Bloom ("Bloom") of the Law Office of James Pratt sent a letter to Fariello, on which Eason was copied, which stated, in relevant part:

> On behalf of its insured, Mr. Eason, GEICO believes that the most fair and equitable way of resolving the claims herein is to coordinate a global settlement conference. Due to the number of individual claimants and the law firms involved, and the coincidence of the holiday period, it would be greatly appreciated if the deadline presented by your clients could be extended in order to permit the scheduling of the global settlement conference.

*Id.* at ¶17.

Fariello agreed to extend the deadline for Defendant to respond to his demand on behalf of Plaintiff, Josh Hajipour, and Jessica Hajipour from January 4, 2007, to January 10, 2007. *Id.* at ¶18. Sinclair advised Eason of this extension and Defendant's plan for a global settlement conference on December 27, 2006. *Id.*

On December 29, 2007, prior to the January 10, 2007 deadline for Defendant to respond, Plaintiff terminated Fariello's representation of her. *Id.* at ¶19. On January 3, 2007, Fariello

informed Defendant via letter that he no longer represented Plaintiff. *Id.* at ¶20. Fariello also "withdrew [Plaintiff's] demand" and, "based on the change in circumstances," requested Defendant to "tender[] its policy limit liability coverage of $25,000.00/$50,000.00 . . . for [Josh Hajipour and Jessica Hajipour] collectively at $25,000.00 per claimant." *Id.* (internal quotation marks omitted). Fariello further advised that "[t]his will be [Defendant's] only opportunity to settle the claims of Josh Hajipour and Jessica Hajipour within [Defendant's] policy limits" and that demand was directed to Defendant and Eason "alone and no other party." *Id.*

On January 4, 2007, Dee Setchel ("Setchel"), an attorney with the Law Office of James Pratt, wrote on behalf of Defendant to all claimants, including Plaintiff, that Defendant had scheduled a global settlement conference for January 8, 2007. *Id.* at ¶21. Setchel explained that Defendant had authorized her to "tender the aggregate policy limits of $25/50 in full and complete settlement of all claims against Marise S. Eason arising from the 11/10/2006 accident." *Id.* Since "that total amount may not be sufficient to fully compensate the parties," Setchel explained, she scheduled the settlement conference "to equitably distribute the settlement proceeds." *Id.*

Attorney Ken Whalen ("Whalen") responded to Setchel's letter on January 4, 2007, advising Setchel that he represented Plaintiff. *Id.* at ¶¶22. Whalen objected to the scheduled global settlement conference and requested that Defendant postpone the conference until Whalen was able to obtain information regarding the available insurance coverages, as well as the injuries and damages of the other parties. *Id.* Whalen requested Setchel to provide him with statutory insurance disclosures, insurance coverage information, and an outline of the injuries sustained by the parties before any settlement conference. *Id.* On January 5, 2007, Setchel advised Whalen that the global settlement conference would proceed as scheduled, but that he could call into the conference by telephone if he was unable to attend in person. *Id.* at ¶23. Setchel also explained the known

5

insurance coverages to Whalen and provided Whalen with an outline of the alleged injuries to the other parties. *Id.*

The global settlement conference was held on January 8, 2007. *Id.* at ¶24. Whalen attended on behalf of Plaintiff; Fariello attended on behalf of Josh Hajipour and Jessica Hajipour; attorney Dick Greco attended on behalf of Zapolski; Jones attended on behalf of ATS and Eason; and Kissane attended on behalf of Hartford. *Id.* Defendant's staff counsel represented both Eason and ATS at the conference. *Id.* On January 9, 2007, Setchel sent a check for $25,000, which represented the per person Policy limits, to Whalen on behalf of Defendant, along with a proposed release of Eason, Eason's wife, and ATS. *Id.* at ¶25. This offer was for "full and final settlement of [Plaintiff's] claim," and was "conditioned upon [Plaintiff] executing a mutually acceptable release of all claims and demands." *Id.* (internal quotation marks omitted). Setchel's letter advised, "A proposed release is attached." *Id.* A second global settlement conference was held on January 24, 2007, which Setchel attended on Eason's behalf. *Id.* at ¶24 n.3. ATS's contribution of additional settlement funds, outside of insurance, toward a global settlement served as the basis for holding this second conference. *Id.*

On January 28, 2010, Plaintiff's current counsel filed a negligence action against Eason (the "Underlying Action"). *Id.* at ¶26. Upon receipt of the lawsuit, Defendant retained attorney James Thompson ("Thompson") to defend Eason in the Underlying Action. *Id.* Eason testified that Defendant provided him with competent counsel in the Underlying Action. *Id.* On September 15, 2016, Plaintiff and Eason agreed to a "Stipulated Final Judgment" in the amount of $1 million (the "Stipulated Final Judgment"), which the state court entered. *Id.* at ¶27. Defendant was not a party to the Stipulated Final Judgment. *Id.* Thereafter, on April 5, 2018, Plaintiff and Eason entered into

a "Joint Stipulation and Agreement," (the "Joint Stipulation and Agreement") to which Defendant was not a party. *Id.*

### B. Procedural History

Plaintiff initiated this action in state court on May 31, 2018, (Doc. 1-1), and Defendant thereafter timely removed the action to this Court. (Doc. 1 at 6). Plaintiff brings one claim of common law bad faith against Defendant, alleging that Defendant did not perform its fiduciary duties in numerous ways, such as failing to evaluate the claims arising from the accident in a timely and appropriate manner, failing to take timely and appropriate actions to minimize the risk of Eason's exposure to an excess judgment, and failing to accept the offer from Plaintiff and the Hajipours promptly when Defendant knew, or should have known, that the injuries sustained by Plaintiff and the Hajipours would substantially exceed the Policy's limits. (Doc. 31 ¶28). Plaintiff further alleges that Defendant's breaches caused Eason's exposure to the excess legal liability in the judgment in the Underlying Action, which Defendant is legally required to satisfy fully to cure the damage incurred by Eason as a result of Defendant's breaches and failure to settle Plaintiff's claim. *Id.* at ¶30.

Defendant moves for summary judgment on Plaintiff's common law bad faith claim. (Doc. 35 at 1–2). Plaintiff moves for partial summary judgment on her claim, seeking certain legal rulings from the Court. (Doc. 36 at 2). The parties filed supplemental briefing, and the Court held oral argument, on causation and damages. (Docs. 86, 87, 92).

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x. 852, 858 (11th Cir. 2006). Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose

motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.    ANALYSIS

In moving for summary judgment, Defendant first argues that, as a matter of law, it did not act in bad faith. (Doc. 35 at 17). Defendant contends that no reasonable jury could conclude that Defendant acted in bad faith in its handling of Plaintiff's bodily injury claim against Eason, it fulfilled its duty of good faith to Eason, and Plaintiff was unwilling to settle her claim against Eason. *Id.* at 1–2, 18–23. Plaintiff, on the other hand, seeks certain legal rulings based on allegedly undisputed facts, such as requesting the Court to find that ATS was not insured under the Policy and that Defendant's January 9, 2007 offer required ATS to be released. (Doc. 36 at 2).

But the threshold issue in this bad faith action is the requisite causal connection between the claimed damages and the alleged bad faith. Indeed, to prevail in a bad faith case, there must be a "causal connection between the damages claimed and the insurer's bad faith." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 903–04 (Fla. 2010). Without this causal connection, Plaintiff's bad faith claim fails. Therefore, the Court begins its analysis with this issue. Defendant argues in its Motion for Final Summary Judgment that the Court should enter summary judgment in its favor because, as a matter of law, Plaintiff failed to obtain an excess judgment or its functional equivalent. (Doc. 35 at 23). Plaintiff contends, both in her response thereto and in her Motion for

Partial Summary Judgment, that the Stipulated Final Judgment is valid and caused by Defendant's bad faith failure to settle. (Docs. 36 at 11; 41 at 18). For the reasons set forth below, the Court agrees that Defendant is entitled to summary judgment because Plaintiff did not obtain an excess judgment or its functional equivalent.

### A.  Excess Judgment and Functional Equivalents

A causal connection between the claimed damages and the insurer's bad faith must exist in order for a party to prevail in a bad faith action. *Perera*, 35 So. 3d at 903–04. "Under ordinary circumstances, a third party must obtain a judgment against the insured in excess of the policy limits before prosecuting a bad-faith claim against the insured's liability carrier." *Cunningham v. Standard Guar. Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994). "Causation is a prerequisite for the claim: for an insured to bring a bad faith claim, the injured party must first win an excess judgment." *Cawthorn v. Auto-Owners Ins. Co.*, 791 F. App'x 60, 64 (11th Cir. 2019) (citing *Cunningham*, 630 So. 2d at 181–82).[2] Thus, "causation is proved with an excess judgment, which is a judgment above the insurance policy limits." *Id.*; *see also Cunningham*, 630 at 181 ("[T]he essence of a third-party bad-faith cause of action is to remedy a situation in which an insured is exposed to an excess judgment because of the insurer's failure to properly or promptly defend the claim."). This rule, referred to as the "excess judgment rule," prevents courts from deciding cases without jurisdiction, as a case or controversy does not exist before an excess judgment. *Cawthorn*, 791 F. App'x at 64.

---

[2] Unpublished decisions of the Eleventh Circuit are not binding precedent, but may be cited as persuasive authority. 11th Cir. R. 36-2.

"An excess judgment is defined as the difference between all available insurance coverage and the amount of the *verdict* recovered by the injured party." *United Servs. Auto. Ass'n v. Jennings*, 731 So. 2d 1258, 1259 n.2 (Fla. 1999) (emphasis added); *see also Cawthorn*, 791 F. App'x at 64 ("[A] judgment is an *excess* judgment when the amount of the verdict recovered by the injured party is greater than all the available insurance coverage.") (emphasis in original). A "verdict" is defined as "[a] jury's finding or decision on the factual issues of a case." *Verdict*, Black's Law Dictionary (11th ed. 2019).

However, "[a]n excess judgment . . . is not always a prerequisite to a bad-faith action." *Perera*, 35 So. 3d at 899. Three recognized exceptions exist under Florida law, which are treated as "functional equivalents" of an excess judgment. *Id.* (citing *Perera*, 35 So.3d at 899). As such, when one of these "functional equivalents" applies, "an insured can show causation based on a stipulation of damages rather than an excess judgment." *Id.* The Supreme Court of Florida has not foreclosed the possibility that other "functional equivalents" to excess judgments may exist. *See Perera*, 35 So.3d at 899 ("We turn now to an examination of the recognized circumstances under Florida case law *that may be relevant to this case* . . . .") (emphasis added); *Cawthorn v. Auto-Owners Ins. Co.*, No. 6:16-cv-2240-Orl-28GJK, 2018 WL 1996835, at *10 (M.D. Fla. Apr. 27, 2018) (Antoon, J.) ("*Perera* does not foreclose the possibility that other alternatives may qualify as the functional equivalent of an excess judgment."), *aff'd*, 791 F. App'x at 60.

The first recognized functional equivalent of an excess judgment involves an excess carrier's "bad-faith claim against a primary insurer by virtue of equitable subrogation under certain circumstances where the primary insurer has not acted in good faith." *Perera*, 35 So. 3d at 900. In other words, an excess carrier incurs damages as a result of the primary carrier's alleged bad faith and brings a bad faith claim against the primary insurer on the basis of equitable subrogation.

11

"Under the doctrine of equitable subrogation, an excess insurer has the right to 'maintain a cause of action . . . for damages resulting from the primary carrier's bad faith refusal to settle the claim against their common insured.'" *Id.* (quoting *U.S. Fire Ins. Co. v. Morrison Assurance Co.,* 600 So. 2d 1147, 1151 (Fla. 1st DCA 1992)).

Second, *Cunningham* agreements constitute another recognized functional equivalent of an excess judgment. *Perera*, 35 So. 3d at 899 (citing *Cunningham*, 630 So. 2d at 182). *Cunningham* agreements "involve the situation where there is not a previous excess judgment but an insurer and a third-party claimant enter into an agreement and stipulate to try the bad-faith issues first." *Id.* The parties to a *Cunningham* agreement also "stipulate that if no bad faith is found, the thirty-party claimant will settle for the policy limits, thus protecting the insured from exposure to an excess judgment." *Id.*

*Coblentz* agreements constitute the third recognized functional equivalent of an excess judgment. *Perera*, 35 So. 3d at 900. C*oblentz* agreements stem from the former Fifth Circuit Court of Appeals' holding in *Coblentz v. American Surety Co. of New York*, 416 F.2d 1059 (5th Cir. 1969).[3] "*Coblentz* agreements arise when the insurance company fails to defend the insured and,

---

[3] In *Coblentz*, an insurer ultimately determined that it was not obligated to defend the insured in a state court action against the insured and withdrew its defense of the insured. 416 F.2d at 1060. The insured subsequently retained other counsel and entered into a jury trial waiver, along with a stipulation of facts and testimony, which resulted in the state court entering judgments for the plaintiff totaling $50,000. *Id.* at 1061. The plaintiff procured the issuance of a writ of garnishment against the insurer after the entry of the state court judgments. *Id.* The insurer contended that the judgment did not obligate it to pay anything because the judgment did not obligate the insured to pay anything. *Id.* at 1063. On appeal, the former Fifth Circuit recognized that, based upon the pleadings, the insurer was obligated to undertake the insured's defense. *Id.* Further, the insurer's decision to leave the insured to his own defenses barred the insurer from subsequently complaining about the form of the judgment. *Id.* Indeed, the former Fifth Circuit recognized that, as a result of the insurer's decision not to defend the insured, "consent[ing] to the entry of a judgment that could be satisfied only from public liability insurance policies covering [the insured] at the time of the incident rather than from his own asserts" was in the insured's "best interest." *Id.*

in response, the insured and the injured third party agree to settle the suit and allow the injured

third party to sue the insurance company on a theory of bad faith." *Cawthorn*, 791 F. App'x at 64

(citing *Coblentz*, 416 F.2d at 1063). Unlike *Cunningham* agreements, *Coblentz* agreements lack

the insurer's participation. *Schultz v. Gov't Emps. Ins Co.*, No. 1:15-cv-172-MW/GRJ, 2018 WL

7185324, at *4 (N.D. Fla. Dec. 7, 2018). The Supreme Court of Florida has explained:

> The opportunity for a settlement without the agreement of the
> insurer traditionally has occurred where an insurer breaches its duty
> to defend, leaving the insured "to its own devices" to settle the case
> or proceed to trial. In those circumstances, the insured is left
> unprotected and may enter into a reasonable settlement agreement
> with the third-party claimant and consent to an adverse judgment for
> the policy limits that is collectable only against the insurer.

*Perera*, 35 So. 3d at 900.

"Florida courts have also extended the reasoning of *Coblentz* to allow agreements by the

insured to a judgment in excess of the policy limits against an insurer who wrongfully refuses to

defend and acts in bad faith." *Id.* "Where an injured party wishes to recover under a *Coblentz*

agreement, 'the injured party must bring an action against the insurer and prove coverage, wrongful

refusal to defend, and that the settlement was reasonable and made in good faith.'" *Chomat v. N.*

*Ins. Co. of N.Y.*, 919 So. 2d 535, 537 (Fla. 3d DCA 2006) (quoting *Quintana v. Barad*, 528 So. 2d

1300, 1301 n.1 (Fla. 3d DCA 1988)). Thus, the insurer's failure to defend is a central feature of

*Coblentz* agreements. The claimant also "must 'assume the burden of initially going forward with

the production of evidence sufficient to make a prima facie showing of reasonableness and lack of

bad faith, even though the ultimate burden of proof will rest upon the carrier.'" *Id.* (quoting *Steil*

*v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589, 592 (Fla. 2d DCA 1984)).

## B.  Application

Preliminarily, the Policy provides, in relevant part:

### 3. ASSISTANCE AND COOPERATION OF THE INSURED

The insured will cooperate and assist us, if requested:

. . .

(b) in making settlements;

(c) in the conduct of suits; and

(d) in enforcing any right of contribution or indemnity against any legally responsible person or organization because of bodily injury or property damage; and

. . .

Only at his or her own cost will the insured make a payment, assume any obligation or incur any cost other than for first aid to others.

4. ACTION AGAINST US

No suit will lie against us:

(a) unless the insured has fully complied with all the policy's terms and conditions, and

(b) until the amount of the insured's obligation to pay has been finally determined, either

(i) by a final judgment against the insured after actual trial; or

(ii) by written agreement of the insured, the claimant and us.

A person or organization or the legal representative of either, who secures a judgment or written agreement, may then sue to recover up to the policy limits.

(Doc. 31-1 at 7) (original emphasis removed).

On August 25, 2016, Thompson provided Defendant with draft copies of the Stipulated Final Judgment and the Stipulation for Final Judgment. (Docs. 35-34 at 1–6). Thompson described these documents as "the offer of Plaintiff to resolve this case short of a trial." (Doc. 35-34 at 1). Thompson advised Defendant that he looked forward to hearing from Defendant. *Id.* The copy of the Stipulated Final Judgment provided by Thompson to Defendant is identical to the court-

executed copy of the same document, which Plaintiff provided. (Docs. 31-3; 35-34 at 3–4). Similarly, Thompson's provided copy of the Stipulation for Final Judgment is identical to the partially executed copy of the same document, as provided by Plaintiff, and neither party objects that these submitted copies are not representative of the final versions of the document. (Docs. 35-34 at 5–6; 36-5 at 1–2).

Under the terms of the Stipulation for Final Judgment, Plaintiff and Eason would agree to settle the Underlying Action to "avoid the expense and uncertainties of a jury trial" and the entry of a judgment. (Doc. 36-35 at 1). To that end, the Stipulation for Final Judgment provided that the settlement would resolve any claims by Plaintiff against Eason in the Underlying Action, except taxable costs and attorney's fees, and the total amount of the stipulated settlement agreement would be $1 million. *Id.* The Stipulation for Final Judgment also provided that, prior to entering into the stipulation, Eason had "confirmed with" Defendant that he was "not violating the terms and conditions of" the Policy, "specifically the clauses involving voluntary assumption/payment and lack of cooperation." *Id.* at 2. Execution of the Stipulation for Final Judgment would not assign any of Eason's rights, claims, or causes of action that Eason had against Defendant arising out of or related to the Underlying Action; Eason made such assignment in the Joint Stipulation and Agreement, executed by Plaintiff and Eason over one-and-a-half years later. (Doc. 31-4 at 2). Finally, the Stipulated Final Judgment would enter judgment in the Underlying Action against Eason, providing that Plaintiff shall recover $1 million from Eason, pursuant to the "Stipulation for Final Judgment entered into by the parties." (Doc. 35-34 at 3–4).

Thompson subsequently inquired whether there was "any word" from Defendant regarding "the stipulated judgment" and informed Defendant that "Eason is asking that we demand that [Defendant] allow him to enter into the stipulation. (Doc. 35-34 at 7). On September 14, 2016,

Daniel Anthony ("Anthony"), a claims examiner of Defendant, responded to Thompson as follows:

> GEICO tried to resolve this claim with [Plaintiff] for the full available policy limits of $25,000. [Plaintiff] refused to settle and filed suit. GEICO has assigned your firm to defend its insured. GEICO will continue to honor its obligation to defend. GEICO will not, however, agree to allow your client to enter into agreements involving extra-contractual issues. It is our understanding that your desire is to end this case by entry of a consent judgment for One Million Dollars ($1,000,000) in favor of [Plaintiff] and against your client, Mr. Eason. If our understanding is correct, GEICO agrees not to raise policy defenses of voluntary payment or failure to cooperate if your client wishes to consent to a judgment against him in the amount of One Million Dollars ($1,000,000). To be clear, GEICO does not agree that [Plaintiff's] claim has a value equal to or greater than One Million Dollars ($1,000,000). GEICO leaves to you and your client the determination of whether agreeing to a judgment in this amount is in your client's best interests.

(Doc. 35-35 at 1).

It is undisputed that Plaintiff and Eason agreed to, and the state court entered, the Stipulated Final Judgment in the Underlying Action, which was in the amount of $1 million. (Doc. 39 ¶27). The court-executed copy of the Stipulated Final Judgment demonstrates that it was entered on September 15, 2016. (Doc. 31-3 at 2). The parties likewise agree that Defendant was not a party to the Stipulated Final Judgment. (Doc. 39 ¶27). Indeed, the Stipulated Final Judgment does not mention Defendant. (Doc. 31-3 at 1–2). Additionally, the Stipulation for Final Judgment did not provide a place for Defendant to sign and, as Plaintiff conceded during oral argument, Defendant did not sign the document. The parties agree that Pratt and Eason entered into the Joint Stipulation and Agreement in 2018, (Doc. 39 ¶27), in which Eason granted an assignment of certain rights, claims, actions, or causes of action that Eason had against Defendant which arose out of or in any way related to the subject matter of the Underlying Action, (Doc. 31-4 at 2). While the parties

stipulate that Defendant was not a party to the Stipulated Final Judgment, they disagree as to whether Defendant agreed to the Stipulated Final Judgment.

On these facts, the Court now examines the existence of an excess judgment or its functional equivalent.

### 1. Excess Judgment

Defendant argues that the parties do not dispute that the Underlying Action lacked a trial and an excess jury verdict. (Doc. 35 at 24). Defendant also argues that a stipulated judgment cannot constitute an excess verdict to establish damages in a third-party bad faith claim. *Id.* As previously noted, the Eleventh Circuit emphasized in *Cawthorn* that, "in this context," a "judgment is a final decision—a verdict—reached by a factfinder. A judgment is an *excess* judgment when the amount of the verdict recovered by the injured party is greater than all the available insurance coverage. A consent judgment, on the other hand, is akin to a private contract, one that is simply acknowledged and recorded by a court." *Cawthorn*, 791 F. App'x at 65 (emphasis in original) (citation and footnote omitted). Although the Eleventh Circuit noted that Florida courts have used "judgment" and "verdict" interchangeably, the court nonetheless observed that Florida courts construe "judgment" narrowly in this context, as demonstrated by the carving out of specific functional equivalents, instead of deeming all consent judgments to be sufficient. *Id.* at 65 n.1. Indeed, the Eleventh Circuit rejected the argument that Florida courts would find a consent judgment to constitute a "judgment" in this narrow context, explaining that adopting this argument would "carv[e] out a fourth exception to the excess judgment rule." *Id.* at 65.

Here, the Stipulated Final Judgment does not constitute an excess judgment. First, the Stipulated Final Judgment does not represent the difference between the amount of a *verdict* and all available insurance coverage. Indeed, a verdict was not rendered in the Underlying Action

because Plaintiff and Eason settled the action and stipulated to the entry of the $1 million judgment against Eason. Significantly, Plaintiff has not argued, through its briefing or during oral argument, that a *verdict* was rendered in the Underlying Action. Further, even when considering any interchangeable use of "verdict" and "judgment," the Court is not persuaded that this type of consent judgment is one that Florida courts would recognize as the requisite type of "judgment" in this narrow context where, as discussed further below, the parties agree that Defendant did not fail to defend Eason and Defendant, through Anthony, explained that it did not agree to Eason's entry into an agreement involving extra contractual issues.

In her supplemental briefing, Plaintiff argues that the Stipulated Final Judgment serves as the requisite type of judgment to bring this bad faith claim.[4] Plaintiff asserts that a judgment entered upon consent or stipulation has "the same legal force and effect as any other judgment." (Doc. 86 at 2). Plaintiff highlights that the Supreme Court of Florida has recognized that consent judgments are entitled to the same preclusive effect as any other judgment issued by a Florida court. *Id.* On this basis, Plaintiff argues that the Stipulated Final Judgment "constitutes an element of damage[s] *as if* it were the product of a jury verdict" since the two are "legally equivalent." *Id.* (emphasis added). As such, during oral argument, Plaintiff argued that "a consent judgment is, for all intents and purposes, the same as a judgment by jury trial."

A consent judgment is a judicially approved contract. *Arrieta-Gimenez v. Arrieta-Negron*, 551 So. 2d 1184, 1186 (Fla. 1989); *Cawthorn*, 791 F. App'x at 65 ("A consent judgment, on the

---

[4] In responding to Defendant's Motion for Final Summary Judgment, Plaintiff argues that the fact that the Stipulated Final Judgment was the product of a stipulation rather than a jury verdict is "of no moment" because "claimants and insureds commonly stipulate to judgments which are enforceable against insurers under so-called *Coblentz* Agreements." (Doc. 41 at 18). This argument fails to explain the existence of the requisite excess judgment, and the inapplicability of *Coblentz* agreements is discussed herein.

other hand, is akin to a private contract, one that is simply acknowledged and received by a court."). Notably, a consent judgment is entitled to the same preclusive, res judicata effect as any other judgment because it is technically a judgment. *Arrieta-Gimenez*, 551 So. 2d at 1186. However, while consent judgments may carry the same preclusive effect as any other judgment, the inquiry is whether a consent judgment constitutes an excess judgment for a bad faith action, not whether a consent judgment broadly constitutes a judgment. Plaintiff's cited authority on this point is devoid of any analysis of *excess* judgments in bad faith cases, nor does the authority stand for the proposition that a consent judgment constitutes the type of "judgment" that Florida courts have recognized as sufficient in the context of this action.

Plaintiff further argues that *Cawthorn* is distinguishable, thereby purportedly supporting her argument that the Stipulated Final Judgment is sufficient. (Doc. 86 at 2). In *Cawthorn*, the plaintiff sustained significant injuries while traveling in a car driven by Ledford, which was owned by Ledford's father's business, Bob Ledford's RV & Marine, Inc ("Bob's RV"). *Id.* at 61. At the time of the accident, Bob's RV was covered by two policies provided by the insurer: a $1 million Garage Liability Policy and a $2 million Commercial Umbrella Policy, totaling $3 million of coverage. *Id.* at 61. Ledford was a scheduled driver on the Garage Liability Policy. *Id.* at 62. In relevant part, after the plaintiff sued Ledford and Bob's RV, the plaintiff's attorney sent a proposed settlement agreement to Ledford and Bob's RV, which required a $33 million consent judgment against Ledford, the plaintiff's covenant not to execute the judgment against Ledford, and tender by the insurer of $3 million policy limits to settle claims against Bob's RV. *Id.* The proposed settlement agreement contained signature lines for the plaintiff, Bob's RV, Ledford, and the insurer. *Id.* A representative of the insurer responded that the insurer would be willing to pay the full $3 million to the plaintiff while continuing to provide a defense for Ledford, but, as to any

19

future consent judgment against Ledford, that would be solely up to the plaintiff, the plaintiff's counsel, and Ledford's counsel. *Id.* As such, the plaintiff and Ledford continued the settlement discussions without the insurer and executed the final agreement. *Id.* at 62–63. The final agreement did not contain a signature line for the insurer, and there was no evidence that the insurer saw the agreement. *Id.* at 63.

The Eleventh Circuit rejected the plaintiff's argument that the consent judgment constituted an excess judgment because final verdicts and consent judgments were indistinguishable in third-party bad faith claims. *Id.* at 65. The court explained that the cited authority was unpersuasive because only one case mentioned whether the defendant-insurer was a party to the consent judgment and that case was "inapposite" because the defendant-insurer was a party to the consent judgment. *Id.*

Here, Plaintiff argues that, unlike *Cawthorn*, Defendant agreed to the resolution of the Underlying Action by entry of the Stipulated Final Judgment. (Doc. 86 at 2). Plaintiff points out that Defendant, through Anthony, agreed not to raise the Policy defenses of voluntary payment or failure to cooperate if Eason desired to have a consent judgment in the amount of $1 million entered against him. *Id.* Plaintiff contends that this agreement was in accordance with the Policy, which requires a final judgment after a trial, or the written agreement of Eason, Plaintiff, and Defendant, before a suit will lie against Defendant. *Id.* at 3. Plaintiff classifies Defendant's representations as demonstrating that Defendant "participated in the consent judgment," which, according to Plaintiff, served as the basis for the Eleventh Circuit finding the plaintiff's submitted authority in *Cawthorn* as "inapposite." *Id.* at 4.

Under Florida contract law, "the acceptance of an offer which results in a contract must be absolute and unconditional, identical with the terms of the offer, and in the mode, at the place, and

within the time expressly or impliedly stated within the offer." *Cheverie v. Geisser*, 783 So. 2d 1115, 1119 (Fla. 4th DCA 2001). In determining whether a settlement agreement is enforceable, "the evidence must clearly demonstrate that there was mutual agreement to the material settlement terms." *Id.* at 1118. Further, a party's assent "is manifested through written or spoken words, or inferred in whole or in part from the parties conduct.'" *L&H Const. Co., Inc. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011) (internal quotation marks omitted). Additionally, "[t]he party seeking enforcement must show that the opposing party assented to the agreement." *Cawthorn*, 2018 WL 1996835, at *8 (citing *Carroll v. Carroll*, 532 So. 2d 1109, 1109 (Fla. 4th DCA 1988)).

Plaintiff has not shown that Defendant's purported acceptance of the offer relayed by Thompson was absolute and unconditional or identical with the terms of the offer. Plaintiff latches on to one portion of Anthony's response to Thompson to claim that Defendant agreed to the entry of the Stipulated Final Judgment. However, when read in its entirety, and in the light most favorable to Plaintiff, Anthony's response simply does not demonstrate Defendant's acceptance of the Stipulated Final Judgment or the Stipulation for Final Judgment. Anthony, on behalf of Defendant, expressly rejected Eason's entry into any agreement involving extra-contractual issues, stating that Defendant would *not* allow Eason to enter into any agreements involving extra-contractual issues. As the $1 million amount of the then-proposed Final Stipulated Judgment exceeded the Policy limits, the judgment would constitute an extra contractual issue.

Anthony also pointed out that Defendant had honored its obligation to provide a defense for Eason and that Eason was Thompson's client. Thus, although Anthony advised that Defendant would not raise policy defenses if Eason desired to consent to a judgment against him in the amount of $1 million, Anthony emphasized that the decision of whether Eason's agreement to the entry of

this $1 million judgment was in Eason's best interests would be left to Thompson and Eason, as Thompson's client. Anthony reiterated that Defendant had attempted to resolve the claim for full available policy limits and had retained Thompson to defend Eason after the lawsuit was filed. Anthony stressed that Defendant did not agree that the value of Plaintiff's claim equaled, or exceeded, $1 million and that Defendant would continue to honor its obligation to defend Eason in the Underlying Action. Anthony's response does not clearly demonstrate the existence of Defendant's mutual agreement to the material settlement terms. Florida law provides that "one who is not a party to a settlement agreement cannot be bound by its terms." *Ahern v. Odyssey Re (London) Ltd.*, 788 So. 2d 369, 371–72 (Fla. 4th DCA 2001). It is undisputed that Defendant was not a party to the Stipulated Final Judgment and did not sign the Stipulation for Final Judgment. As such, no reasonable jury could find that Defendant accepted the terms of the Stipulated Final Judgment or the Stipulation for Final Judgment.

Further, no reasonable jury could find that Defendant otherwise assented to the Stipulated Final Judgment or the Stipulation for Final Judgment. The Policy provides that a suit may not lie against Defendant "until the amount of the insured's obligation to pay has been finally determined" by a final judgment against Eason after actual trial or by a written agreement of Eason, Plaintiff, and Defendant. (Doc. 31-1 at 7). Plaintiff argues that Defendant complied with this requirement of the Policy when Anthony advised that Defendant agreed not to raise policy defenses if Eason and Thompson determined that it was in Eason's best interest to enter into the Stipulated Final Judgment. However, Plaintiff has failed to offer any substantive argument as to how the Court should interpret this section of the Policy, including the final determination of Eason's "obligation to pay" or the type of "written agreement" required therein.

Additionally, Anthony's response that Defendant would not raise the voluntary payment or the failure to cooperate Policy defenses does not demonstrate that Defendant assented to a stipulated judgment in excess of the Policy limits, especially in light of Defendant's express rejection of allowing Eason to enter into an agreement for extra-contractual issues and objection to the value of the proposed Stipulated Final Judgment.[5] Anthony's explanation that the determination of whether Eason's entry into the proposed Stipulated Final Judgment was in his best interests "differs from stating an insured may enter into a *specific* settlement agreement or consent judgment and thereby bind the insurer." *Cawthorn*, 2018 WL 1996835, at *9. Even if the Court were to find that Anthony's response constituted the requisite written agreement by Plaintiff, Defendant, and Eason, Plaintiff fails to explain how such an agreement could provide a legal basis for considering a consent judgment a "judgment," as narrowly defined in this context. And, as previously mentioned, Defendant did not sign the Stipulation for Final Judgment. "[A]n insurer is not bound by an unauthorized settlement notwithstanding the terms of its policy" requiring the insurer's consent to settle. *Schultz*, 2018 WL 7185324, at *6; *see also Zurich Am. Ins. Co. v. Frankel Enters., Inc.*, 509 F. Supp. 2d 1303, 1312 (S.D. Fla. 2007) ("[A]n insurer cannot be bound by an unauthorized settlement when it has not refused to defend, even if it denies coverage."); *Cawthorn*, 2018 WL 1996835, at *10 ("Only *Coblentz* agreements allow the insured and third-party claimants to determine an insured's excess exposure independently."). As Plaintiff admitted during oral argument that she relies on only Anthony's communication, she has failed to point to any other words or conduct demonstrating Defendant's assent.

---

[5] To the extent that Plaintiff argues that Defendant's agreement not to raise the voluntary payment or failure to cooperate Policy defenses constitutes a waiver and Defendant cannot now rely on such defenses, Defendant does not rely on the defenses to challenge the bad faith claim. Instead, Defendant challenges the bad faith claim, in part, on the grounds that the requisite excess judgment or functional equivalent are absent.

Finally, Defendant's attempt to distinguish *Cawthorn* to establish the requisite excess judgment is unavailing. Although the Eleventh Circuit distinguished a cited case on the basis that the insurer in that case was a party to the consent judgment, thereby making the case inapposite, Plaintiff has failed to establish here that Defendant was a party to the Stipulated Final Judgment or the Stipulation for Final Judgment.[6] Defendant appointed Thompson to defend Eason in the Underlying Action. Thompson's actions in the defense of Eason cannot be said to bind Defendant. *See Cawthorn*, 2018 WL 1996835, at *9 ("And an insurer cannot be bound by the actions of an appointed attorney over which it had no control.").

In sum, the question is whether the Stipulated Final Judgment constitutes an excess judgment. Defendant has shown that there is no genuine dispute of material fact that there was not an excess judgment in the Underlying Action: the Stipulated Final Judgment does not represent the difference between a *verdict* and all available insurance coverage. There was no verdict in the Underlying Action. Florida courts construe "judgment" narrowly, and the Court is unpersuaded that the type of consent judgment here is one that Florida courts would recognize as the requisite type of "judgment." Finding a consent judgment such as the Stipulated Final Judgment to be an excess judgment would carve out an additional exception to the excess judgment rule. No reasonable jury could find that Defendant agreed to the Stipulation Final Judgment or the Stipulation for Final Judgment. Nonetheless, as demonstrated above, an excess judgment is not always a prerequisite to a bad faith action. The question accordingly becomes whether this action

---

[6] The case distinguished by the Eleventh Circuit in *Cawthorn* mentions only in passing, without further explanation or analysis, that a stipulated judgment in excess of the policy limits was "entered by agreement among" the injured party, the insured, the insured's husband, and the insurer. *Gutierrez v. Yochim*, 23 So. 3d 1221, 1224 (Fla. 2d DCA 2009).

presents a "functional equivalent" to an excess judgment. Accordingly, the Court turns to the functional equivalents.

### 2. *Cunningham* Agreements and Excess Carrier

The Court easily dispenses with two of the functional equivalents. First, the Stipulation for Final Judgment—the agreement between Eason and Plaintiff in the Underlying Action—does not present a scenario in which an excess carrier brings a bad faith claim against a primary insurer by virtue of equitable subrogation. Next, the Stipulation for Final Judgment is not akin to a *Cunningham* agreement because the agreement is not one in which Defendant, as the insurer, and Plaintiff, as the third-party claimant, stipulated to try bad-faith issues first. Further, the Stipulation for Final Judgment did not provide that Plaintiff would settle for the Policy limits if no bad faith was found. Accordingly, these two functional equivalents are inapplicable.

### 3. *Coblentz* Agreements

Having recognized that the Stipulated Final Judgment does not constitute an excess judgment and having dispensed with two of the three recognized functional equivalents, the Court must examine whether the Stipulation for Final Judgment constitutes a *Coblentz* agreement. For the reasons set forth below, the agreement does not constitute a *Coblentz* agreement.

As described above, *Coblentz* agreements arise when an insurer fails to defend the insured and, thereafter, the insured and the injured party agree to settle the suit and allow the injured third-party to file a bad faith lawsuit against the insurer. Contending that the agreement is not a *Coblentz* agreement, Defendant highlights that it complied with its duty to defend and retained Thompson on Eason's behalf in the Underlying Action. (Doc. 35 at 4). Indeed, the parties do not dispute that Defendant retained Thompson on Eason's behalf in the Underlying Action upon Defendant's

receipt of the lawsuit or that Eason testified that Defendant provided him with competent defense counsel in the Underlying Action.

Plaintiff admits in her response to Defendant's Motion for Final Summary Judgment that the Underlying Action's judgment resulted from a stipulation between the parties, rather than a verdict, but asserts that the lack of verdict is "of no moment," as "claimants and insureds commonly stipulate to judgments which are enforceable against insurers under so-called *Coblentz* [a]greements." (Doc. 41 at 18). Plaintiff claims that "*Coblentz* [a]greements are typically entered into where the insurer denies coverage," yet also claims that Defendant did not deny coverage to Eason. *Id.* During the final minutes of oral argument, Plaintiff argued that "this is really a *Coblentz* agreement arrived at by contracting of the parties."

Plaintiff's attempts to argue that the Stipulation for Final Judgment constitutes a *Coblentz* agreement are unavailing. Critically, the parties agree that: Defendant made the decision to provide coverage for the accident on December 14, 2006; upon Plaintiff's filing of the Underlying Action, Defendant hired Thompson to defend Eason in the Underlying Action upon receipt of the lawsuit; and Eason testified that Defendant provided him with competent defense counsel in the Underlying Action. Anthony's response to Thompson also clearly emphasized that Defendant would continue to honor its obligation to provide a defense for Eason, which Plaintiff does not dispute. Plaintiff admits on the first page of her supplemental briefing that Defendant provided counsel to defend Eason against her claims. (Doc. 86 at 1). *Coblentz* agreements discourage insurers from breaching the duty to defend and leaving insureds to their "own devices" to settle the case or proceed to trial. *Perera*, 35 So. 3d at 900. Plaintiff does not claim that this occurred here. Because it is undisputed that Defendant did not fail to defend Eason in the Underlying Action, the agreement in the instant action does not constitute a *Coblentz* agreement.

## IV.    CONCLUSION

There is no genuine dispute of material fact that an excess judgment or functional equivalent, which serves as the requisite causal element for a bad faith claim, is absent. Because this causal element is absent, Plaintiff's bad faith claim necessarily fails, and the Court need not examine whether a genuine dispute of material fact exists as to whether Defendant acted in bad faith. Defendant is entitled to judgment as a matter of law. Therefore, Defendant's Motion for Final Summary Judgment is due to be granted. Plaintiff's Motion for Partial Summary Judgment is due to be denied, as moot.

Accordingly, it is **ORDERED**:

1.  Defendant's Motion for Final Summary Judgment (Doc. 35) is **GRANTED**.

2.  Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 36) is **DENIED**.

3.  The Clerk is directed to enter **JUDGMENT** in favor of Defendant Government Employees Insurance Company and against Plaintiff Ambar Pratt, F/K/A Ambar Torres, as assignee of Marise S. Eason.

4.  The Clerk is further directed to terminate all pending motions and close this case.

**DONE AND ORDERED** in Tampa, Florida on July 2, 2020.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

27