# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

AMBAR PRATT,

     Plaintiff,

v.                                      Case No: 8:18-cv-1607-CEH-AEP

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

     Defendant.
_____

## ORDER

This cause comes before the Court upon Defendant's Motion for Final Summary Judgment (Doc. 35), Plaintiff's Motion for Partial Summary Judgment (Doc. 36), Responses to these motions (Docs. 40, 41), Replies in support of the motions (Docs. 43, 44), Defendant's Supplement to the Briefing (Doc. 117), and Plaintiff's Response (Doc. 119). Both motions are ripe for the Court's review.[1] Having considered the parties' submissions and being fully advised in the premises, the Court will deny Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Partial Summary Judgment.

---

[1] The Court previously granted summary judgment in favor of Defendant on the threshold issue of causation. Doc. 93. The Eleventh Circuit subsequently vacated the Court's order and remanded this case for further consideration in light of *McNamara v. GEICO,* 30 F.4th 1055 (11th Cir. 2022).

## I.   BACKGROUND

### A. Undisputed Facts[2]

This lawsuit stems from a multiple-vehicle accident that caused several serious injuries and a death. Doc. 39. On November 10, 2006, Marise S. Eason rear-ended a vehicle driven by Josh Hajipour, in which Ambar Pratt (f/k/a Ambar Torres), Jessica Hajipour, and Jaclynne McCrary were passengers. *Id.* ¶1. The force of the collision propelled the vehicle forward into a third car driven by Michael Zapolski. *Id.* This accident caused numerous injuries—including to Pratt, Zapolski, Josh Hajipour, Jessica Hajipour, Jason Ortiz, and Shane Richardson. *Id.* Tragically, it also resulted in McCrary's death. *Id.* Ambar Pratt, as assignee of Marise S. Eason ("Plaintiff"), now brings this third-party bad faith insurance claim against Government Employees Insurance Company ("Defendant").

At the time of the accident, Defendant insured Eason and his wife under an automobile liability insurance policy (the "Policy"), which provided bodily injury liability coverage with limits of $25,000 per person and $50,000 per occurrence. *Id.* ¶2. Eason reported the accident to Defendant about a month after it happened, because he was not initially aware that the Policy would cover an accident in his employer's vehicle. *Id.* ¶3. Defendant opened an investigation the day it learned of the accident and assigned Leslie Sinclair, a claims examiner, to handle the claim. *Id.* ¶4.

---

[2] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the Joint Stipulation of Agreed Material Facts (Doc. 39), deposition transcripts and other evidence in the record.

On December 8, 2006, Sinclair obtained a recorded statement from Eason as part of the investigation. *Id.* ¶5. Eason explained that he was driving a vehicle for his employer Atlantic Tower Services ("ATS") at the time of the accident. *Id.* Sinclair learned that ATS's insurer Hartford Fire Insurance Company ("Hartford") had retained an attorney, Teresa Jones, to represent Eason and ATS. *Id.* ¶6. Sinclair contacted Jones, who reported that the accident had resulted in one fatality and injuries to several parties. *Id.* Jones specifically noted that Plaintiff had suffered facial fractures, was in a coma, could potentially lose an eye, and anticipated further surgery. Doc. 26-1 at 7–8. She also reported that Hartford had received a policy limits demand for $1 million on behalf of the deceased party. Doc. 39 ¶6.

Defendant decided to provide coverage for the accident on December 14. *Id.* ¶8. It sent a certified letter to Eason that day, which: (1) set forth the available limits under the Policy; (2) advised that the claims arising from the accident would exceed the Policy's limits; (3) informed him of his right to seek legal counsel regarding any personal liability that may arise from the claims, as well as his right to contribute any personal funds to the settlement of the claims; (4) informed him of the various claims being presented; and (5) advised that the claims against him could exceed Hartford's $1 million policy limits. *Id.* ¶9. Also on December 14, 2006, attorney Joseph Kissane ('Kissane") notified Defendant that Hartford had received a second demand for the Hartford policy's limits from attorney Dominic Fariello ("Fariello"), who represented Plaintiff, Josh Hajipour, and Jessica Hajipour. *Id.* ¶ 10. When Kissane advised Sinclair that he intended to schedule a global settlement conference to resolve the claims

against ATS and Eason, Sinclair advised him of her desire for a representative of Defendant to be involved in any global settlement conference. *Id.* On December 15, Defendant authorized settlement authority for the entire $50,000 bodily injury liability per occurrence limit and advised Hartford's attorney, Jones, that it was offering this amount to contribute towards the settlement of all claims. *Id.* ¶¶11–12.

On December 20, Plaintiff's attorney, Fariello, sent a time-sensitive demand letter to Defendant on behalf of Plaintiff and the Hajipours. *Id.* ¶13. The letter described the injuries suffered by each of his clients and provided estimated future medical bills. Doc. 26-2. Plaintiff's injuries were described as severe. The letter explained that she had suffered "injuries to [her] skull, face, right eye and possible loss of hearing," and would need plastic surgery, eye surgery, and (possibly) facial surgery. *Id.* at 3. She was estimated to have incurred $98,449 worth of medical costs, and Fariello anticipated that her medical costs would total more than $150,000. *Id.* at 2–3. Fariello demanded that the $50,000 per occurrence policy limit be paid within fifteen days of the date of the letter, January 4, 2007, to settle the injury claims of Plaintiff, Josh Hajipour, and Jessica Hajipour. *Id.* He emphasized that the demand was directed to Defendant and its "insured Marise S. Eason alone and no other party." *Id.* at 1.

On December 21, Defendant's regional claims manager, Mark Sugden, recommended that the case be referred to staff counsel who would represent Eason and coordinate a global settlement conference to resolve the claims. Doc. 39 ¶14. Hartford's attorney, Jones, advised Defendant on that day that Hartford had tendered its $1 million policy limits to McCrary's estate in exchange for a release of ATS and

Eason, thereby exhausting Hartford's available policy limits. *Id.* On December 26, Defendant wrote to Eason, enclosing a copy of Fariello's demand letter and advising him that it had retained the Law Office of James Pratt on Eason's behalf, and that ATS had settled with McCrary's estate for the Hartford policy's $1 million limit, thereby exhausting Hartford's available policy limits. *Id.* ¶16.

Defendant next asked its retained counsel to schedule a global settlement conference to try to settle all claims. *Id.* Cosmo Bloom, of the Law Office of James Pratt, sent a letter to Fariello, on which Eason was copied, stating in relevant part that:

> On behalf of its insured, Mr. Eason, GEICO believes that the most fair and equitable way of resolving the claims herein is to coordinate a global settlement conference. Due to the number of individual claimants and the law firms involved, and the coincidence of the holiday period, it would be greatly appreciated if the deadline presented by your clients could be extended in order to permit the scheduling of the global settlement conference.

*Id.* ¶17.

Fariello agreed to a six-day extension, extending the deadline for Defendant to respond to his demand on behalf of Plaintiff, Josh Hajipour, and Jessica Hajipour from January 4, 2007, to January 10, 2007. *Id.* ¶18. Sinclair advised Eason of this extension and Defendant's plan for a global settlement conference on December 27, 2006. *Id.*

On December 29, 2006, Plaintiff terminated Fariello as her attorney. *Id.* ¶19. Fariello informed Defendant of this development on January 3, 2007. *Id.* ¶¶19–20. He withdrew Plaintiff's demand and, "based on the change in circumstances," now requested Defendant to "tender[] its policy limit liability coverage of

$25,000.00/$50,000.00" for the Hajipours, collectively, at $25,000.00 per claimant. *Id.* ¶20 (internal quotation marks omitted).

On January 4, 2007, attorney Dee Setchel ("Setchel"), an attorney with the Law Office of James Pratt, sent a letter on behalf of Defendant to all claimants, advising that a global settlement conference had been scheduled for January 8, 2007. *Id.* ¶21. She explained that Defendant had authorized her to "tender the aggregate policy limits of $25/50 in full and complete settlement of all claims against Marise S. Eason arising from the 11/10/2006 accident." *Id.* She added that, "[b]ecause that total amount may not be sufficient to fully compensate the parties," the settlement conference would aim to "equitably distribute the settlement proceeds." *Id.* Eason was copied on this letter. *Id.*

Plaintiff's newly retained attorney, Ken Whalen ("Whalen"), responded to the letter. *Id.* ¶22. He objected to the scheduled settlement conference date and asked that Defendant postpone the conference until he was able to obtain information regarding the available insurance coverages and the injuries and damages of the other parties. *Id.* Whalen asked for statutory insurance disclosures, insurance coverage information, and an outline of the injuries sustained by the parties. *Id.* Setchel responded that the global settlement conference would proceed as scheduled, and that Whalen could join telephonically if unable to attend in person. *Id.* ¶23. Setchel also explained the known insurance coverages to Whalen and provided him with an outline of the alleged injuries to the other parties. *Id.* The global settlement conference was held on January 8, 2007. *Id.* ¶24. Whalen attended on behalf of Plaintiff; Fariello attended on behalf of

Josh Hajipour and Jessica Hajipour; attorney Dick Greco attended on behalf of Zapolski; Jones attended on behalf of ATS and Eason; and Joseph Kissane attended on behalf of Hartford. *Id.* Defendant's staff counsel attended on behalf of both Eason and ATS. *Id.*

On January 9, Defendant sent Whalen a check for $25,000—the amount of the per person policy limits—along with a proposed release of Eason, Eason's wife, and ATS. *Id.* ¶25. The check was offered for "full and final settlement of [Plaintiff's] claim," and was "conditioned upon [Plaintiff] executing a mutually acceptable release of all claims and demands." *Id.* (internal quotation marks omitted). Setchel's letter advised, "A proposed release is attached." *Id.* A second global settlement conference was held on January 24, 2007, which Setchel attended on Eason's behalf. *Id.* at ¶ 24 n. 3. Plaintiff did not accept the January 9 offer, and the settlement check was re-issued numerous times in the following years. Doc. 35-33.

More than three years passed, and in January 2010, Plaintiff filed a negligence action against Eason (the "Underlying Action"). Doc. 39 ¶26. Defendant retained attorney James Thompson to defend Eason in the Underlying Action. *Id.* On September 15, 2016, Plaintiff and Eason agreed to a "Stipulated Final Judgment" in the amount of $1 million, which the state court entered. *Id.* ¶27. Subsequently, on April 5, 2018, Plaintiff and Eason entered into a "Joint Stipulation and Agreement," to which Defendant was not a party. *Id.* As part of the Joint Stipulation and Agreement, Eason assigned Plaintiff all rights, claims, actions, or causes of action he had against Defendant arising out of the accident or Underlying Action. Doc. 1-6 at 4–5.

### B. Procedural History

Plaintiff filed this lawsuit in state court on May 31, 2018, alleging common law bad faith against Defendant and Hartford. Doc. 1-1 ¶¶22–39. Defendant removed the action to this Court on the basis of diversity jurisdiction. Doc. 1 at 2–6. Plaintiff later filed an amended complaint which dropped Hartford from the suit. Doc. 31 ¶¶22–30. The Complaint alleges that Defendant breached its fiduciary duties to Eason in numerous ways, including by failing to evaluate the claims in a timely and appropriate manner, failing to take timely and appropriate actions to minimize the risk of his exposure to an excess judgment, and failing to accept the offer from Plaintiff and the Hajipours when it knew, or should have known, that their injury claims would substantially exceed the Policy limits. *Id.* ¶28. Plaintiff asserts that Defendant's bad faith caused Eason to be exposed to excess liability in the Underlying Action and that it must now satisfy the judgment, in full, to cure the damage it caused Eason. *Id.* ¶30.

Defendant moves for summary judgment, arguing that no reasonable jury could find in Plaintiff's favor. Doc. 35 at 1–2. Plaintiff opposes and itself moves for partial summary judgment, requesting that the Court find that: (1) ATS was not insured under the Policy; (2) Defendant's January 9, 2007, settlement offer required ATS to be released; (3) a potential indemnification claim was not a basis for Defendant to attempt to settle the claims against ATS; and (4) the consent judgment is reasonable and enforceable against Defendant. Doc. 36 at 2; Doc. 41.

The Court previously entered an order granting summary judgment for Defendant on the threshold issue of causation and denying Plaintiff's Motion for

Partial Summary Judgment as moot. Doc. 93. The Court found that Plaintiff failed to raise a genuine issue of material fact as to whether Defendant's alleged bad faith resulted in an excess judgment or a functional equivalent—which is necessary to prove causation. *Id.* at 27. Although Plaintiff and Eason agreed to a Stipulated Final Judgment in excess of the policy limits, the Eleventh Circuit had previously stated (albeit in an unpublished opinion) that a consent judgment did not qualify as an excess judgment or a functional equivalent for the purposes of a bad faith action. *Id.* at 17–24. The Court thus found that Plaintiff's claim failed on causation and declined to decide whether a genuine dispute of material fact existed as to the bad faith claim. *Id.* at 27.

Plaintiff appealed. Docs. 97, 108. On June 14, 2022, the Eleventh Circuit issued a *per curiam* decision vacating the Court's summary judgment order and remanding it for further consideration in light of *McNamara v. GEICO,* 30 F.4th 1055 (11th Cir. 2022). *See Pratt v. Gov't Emps. Ins. Co.,* No. 20-12718, 2022 WL 2125532 (11th Cir. June 14, 2022). In *McNamara*, the Eleventh Circuit rejected its prior ruling that a stipulated judgment cannot serve as an excess judgment in a bad faith lawsuit. 30 F.4th at 1061–62 (quoting *Pelaez v. Gov't Emps. Ins. Co.,* 13 F.4th 1243, 1248 (11th Cir. 2021), *cert. denied*, 142 S. Ct. 1672 (2022)). It found that the previous decision misinterpreted Florida law and held that, "under Florida law, '[a] stipulated judgment . . . would be a way to obtain an excess judgment that could be used in a bad faith lawsuit' against an insurer." *Id.* Subsequently, as instructed by the Court, the parties filed supplemental briefing as to their cross-motions. Docs. 117, 119.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, along with any affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden is discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. However, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 Fed. App'x. 852, 858 (11th Cir. 2006). Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the undisputed facts. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that cross-motions for summary judgment will not, in themselves, warrant a grant of summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed. *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. *Id.* at 1555–56.

## III.   ANALYSIS

### A. Defendant's Motion for Summary Judgment

In its motion for summary judgment, Defendant asserts that no reasonable jury could find that it acted in bad faith in handling Plaintiff's claim against Eason. Doc.

35 at 1. Defendant contends that it fulfilled its duty of good faith to Eason by investigating liability and damages, promptly offering the Policy's $50,000 per occurrence bodily injury limits to all claimants, coordinating a global settlement conference in an attempt to resolve as many claims as possible within the Policy's limits, immediately tendering the Policy's per person limits with a proposed release to Pratt following the global settlement conference, and keeping Eason apprised of the claims resolution process. *Id.* at 2. Finally, Defendant avers that summary judgment is warranted because Pratt was unwilling to settle her claim against Eason—thereby foreclosing any realistic settlement opportunity—and because Plaintiff fails to establish the element of damages. *Id.*

Plaintiff responds that summary judgment is inappropriate because a reasonable jury could determine that Defendant failed to act reasonably and diligently by not settling Plaintiff's claim against Eason. Doc. 41 at 15. In support of this argument, Plaintiff alleges that Defendant knew early in the claims process that Plaintiff was the most seriously injured claimant and nevertheless failed to accept her demand. *Id.* Plaintiff also contends that a reasonable jury could determine that Defendant's failure to settle resulted from its improper determination that ATS was an insured. *Id.* Finally, Plaintiff argues that she has properly alleged damages, and that Defendant's argument for summary judgment improperly focuses on the fact that Plaintiff's second attorney in the Underlying Action never made a settlement demand to Defendant. *Id.* at 16–20.

Defendant's supplemental filing argues further that no reasonable jury could conclude that it acted in bad faith. Doc. 117. It cites numerous Eleventh Circuit

decisions affirming grants of summary judgment for insurance companies that were published after its initial motion for summary judgment. *Id.* It also argues that an insurer's decision to pursue a global settlement when there are multiple claimants is consistent with its duty of good faith as a matter of law. *Id.* at 3–9. On the issue of damages, Defendant does not attempt to distinguish this case from *McNamara* or otherwise reinforce its original argument.

Plaintiff responds to Defendant's supplemental brief, arguing that whether Defendant acted in bad faith is a fact question that should be decided by a jury. Doc. 119 at 9–16. Plaintiff also argues that Defendant fails to explain the relevance of the new authority it cites and that those cases are distinguishable. *Id.* at 16. Finally, Plaintiff asserts that there is at least a fact question regarding whether the claim could have settled, and that Defendant's motion for summary judgment should thus be denied. *Id.* at 20.

For the reasons set forth below, a reasonable jury could find that Defendant failed to act reasonably and diligently by not settling Plaintiff's claim against Eason. Thus, Defendant's motion for summary judgment is due to be denied.

### i.  Bad Faith Legal Standard

"Bad faith law was designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims." *Berges v. Infinity Ins. Co.*, 896 So.2d 665, 682–683

(Fla. 2004). An insurer defending claims against its insured "has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So.2d 783, 785 (Fla. 1980). Indeed, "when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured." *Id.* The Florida Supreme Court has explained what this duty requires of insurers:

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

*Id.* (internal citations omitted).

These obligations are no mere checklist, and an insurer is not absolved of liability simply because it advises its insured of settlement opportunities, the probable outcome of the litigation, and the possibility of an excess judgment. *Harvey v. GEICO Gen. Ins. Co.*, 259 So.3d 1, 7 (Fla. 2018). Instead, the "critical inquiry" in a bad faith action is "whether the insurer diligently, and with the same haste and precision as if it

were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Id.*

A threshold causal requirement in a bad faith action is that "[t]he damages claimed by an insured in a bad faith case 'must be caused by the insurer's bad faith.'" *Id.* (quoting *Perera v. U.S. Fidelity & Guar. Co.*, 35 So.3d 893, 902 (Fla. 2010)). Further, "the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges*, 896 So.2d at 680. And generally, the question of bad faith will be for "the jury to decide." *Harvey*, 259 So.3d at 7 (quoting *Boston Old Colony*, 386 So.2d at 785). "However, numerous courts have held that, where the evidence establishes that no reasonable jury could find the insurance company acted in bad faith, a court can and should enter summary judgment for the insurer." *Valle v. State Farm Mut. Automobile Ins. Co.*, No. 08-22117-CIV, 2010 WL 5475608, at *3 (S.D. Fla. Jan. 15, 2010), *aff'd sub nom. Valle v. State Farm Mut. Auto. Ins. Co.*, 394 F. App'x 555 (11th Cir. 2010).

The accident in this case led to multiple injured claimants, which means that Defendant's actions must also be analyzed under a second standard. *See Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So.2d 555, 560 (Fla. 4th DCA 2003) ("Therefore, the *Boston Old Colony* standard applies to all Florida cases alleging insurer bad faith, and *Harmon* applies to the subset of those cases involving multiple competing claims. Under this rationale, the present case is subject to both standards.") When an insurer faces multiple competing claims, it "may enter into reasonable settlements with chosen

claimants, even if those settlements fully exhaust the policy limits, leaving one or more claimants without recourse against the insurer, so long as the insurer's decision to do so is reasonable and within the purview of its duty of good faith." *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015). In order to satisfy its duty of good faith, "the insurer must: (1) fully investigate all claims arising from a multiple claim accident; (2) seek to settle as many claims as possible within the policy limit; (3) minimize the magnitude of possible excess judgments against the insured by reasoned claim settlement; and (4) keep the insured informed of the claim resolution process." *Gen. Sec. Nat'l Ins. Co. v. Marsh*, 303 F. Supp. 2d 1321, 1325 (M.D. Fla. 2004) (Hodges, J.) (citing *Farinas*, 850 So.2d at 560–561).

Based on the foregoing, the Court begins with an examination of Defendant's degree of care, diligence, precision, and haste. The Court then turns to the multiple-claim standard for bad faith actions. Next, the Court addresses Defendant's claim that Plaintiff was unwilling to settle. Finally, the Court concludes by analyzing whether a reasonable jury could find that Defendant acted in bad faith, considering the totality of the circumstances.

### a) Defendant's Degree of Care, Diligence, Precision, and Haste

Defendant avers that it "diligently worked on behalf of Eason to avoid an excess judgment with the same haste and precision as if it were in Eason's shoes." Doc. 35 at 18–19. Plaintiff disagrees, arguing that Defendant should have settled her claim

against Eason and that it improperly determined that ATS was an insured it needed to protect. Doc. 41 at 15–16.

First, the Court considers Defendant's haste in dealing with the claims. Upon learning of the accident, Defendant immediately began an investigation and assigned Sinclair to handle the claim. By the next day, Sinclair had obtained a recorded statement from Eason and contacted an attorney for ATS to gather information about the injuries and settlement demands. Doc. 39 ¶¶4–5. Defendant decided to cover Eason less than a week after receiving notice of the accident. Doc. 35-4 at 7. And a day after deciding to provide coverage, Defendant authorized settlement authority for the entire $50,000 bodily injury liability per occurrence limit. Doc. 35-4 at 8–9.

Fariello, Plaintiff's counsel, first contacted Defendant to make a settlement demand on December 20, 2006. Doc. 35-12. Defendant also learned on this date that McCrary's estate had settled with Hartford for its $1 million policy limits, in exchange for a release of ATS and Eason. Doc. 35-4 at 22–23. Consequently, Defendant knew at this time that claims by Plaintiff and the Hajipours, at a minimum, remained pending against Eason. On December 26, 2006, one of Defendant's attorneys wrote to Fariello, stating that Defendant believed coordinating a global settlement conference would be "the most fair and equitable way of resolving the claims." Doc. 39 ¶17.

On January 4, 2007, Setchel notified all claimants that Defendant had scheduled a global settlement conference. She noted that Defendant had authorized her to tender the Policy's full $25,000/$50,000 limits "in full and complete settlement of all claims against Marise S. Eason" arising from the accident. *Id.* ¶21. The settlement

conference was held on January 8, 2007 and the next day Defendant sent a check for $25,000 to Whalen, which represented the Policy's bodily injury per person limit "in full and final settlement of [Plaintiff's] claim." Doc. 35-26 at 1. An enclosed letter advised that the settlement was "conditioned upon [Plaintiff] executing a mutually acceptable release of all claims and demands" and included a proposed release. *Id.* Therefore, within thirty-three days of receiving notice of the accident, Defendant offered the Policy's entire $25,000 per person limits to Plaintiff, along with a release.

As to Defendant's diligence, precision, and care, Plaintiff argues that Defendant did not act reasonably and diligently when it rejected Fariello's initial offer despite knowing that Plaintiff had the most serious outstanding claim. Doc. 41 at 15. She contends that Fariello's offer presented an opportunity to settle her claims, as well as those of the Hajipours, which would have left only Zapolski's "relatively minor soft-tissue injury." *Id.*

The record indicates that Defendant knew Plaintiff's injuries were severe soon after it learned of the accident. Claim notes reveal that as early as December 8, 2006, Defendant learned that Plaintiff was "seriously injured with facial [fractures]," in a coma, at risk of losing an eye, and likely needed "add[itional] plastic surgery." Doc. 26-1 at 7–8. At that time, whether Zapolski had sustained injuries was unknown, and Josh Hajipour was noted as having sustained "minor injuries." *Id.* at 4, 8. Moreover, Defendant received further information about Plaintiff's injuries from Hartford's attorney on December 14, 2006. *Id.* at 17. Although the precise content of this conversation was not recorded, Plaintiff argues that Hartford's attorney probably

relayed the same facts that he memorialized in a letter to Hartford sent the same day. That letter detailed McCrary's death, the Hajipours' injuries, Plaintiff's injuries, and Zapolski's injuries. Doc. 41-3 at 1–4. It explained that, of the three survivors in the Hajipour vehicle, Plaintiff was "clearly the most seriously injured" and had already incurred medical bills totaling $57,439. *Id.* at 4. The letter also noted that, although Zapolski's lawyer had informed Kissane that his injuries were "soft tissue in nature," the police report from the accident described Zapolski's injuries as "incapacitating injuries" and he was scheduled for an MRI. *Id.*

Defendant's December 14, 2006 letter to Eason recognized Plaintiff's claims as the most serious of the surviving individuals, describing the injuries as follows: "Joshua Hajipour, non specific soft tissue; Jaclynne McCrary, fatality; [Plaintiff], multiple facial and skull fractures, possible hearing loss; Jessica Hajipour, soft tissue injuries and a fracture of the left orbital floor; Michael Zapolski, non specific soft tissue injuries." Doc. 35-9. Fariello's initial demand letter, sent on December 20, 2006, further reinforced the severity of Plaintiff's injuries. It asserted that Plaintiff had incurred $98,449 in medical expenses, compared to $50,236 in medical expenses for Josh Hajipour and $75,992 in medical expenses for Jessica Hajipour. Doc. 35-12 at 1. Thus, Fariello claimed that Plaintiff's medical expenses alone far exceeded the Policy's $25,000 per person limit, with the medical expenses for Plaintiff and the Hajipours combined far exceeding the Policy's $50,000 per occurrence limit. And while he stated that Plaintiff's treatment was "unknown" in the demand letter, Fariello clearly detailed the extent of Plaintiff's severe injuries. *Id.* at 3. Although Fariello did not attach any

medical bills to the demand letter to support these assertions, contending he had "[n]o reports or bills at this time," Setchel testified that, "[f]rom the get-go," Defendant believed that Plaintiff had the most severe claim based on the demand letter and that Zapolski's "soft tissue claims" and the other minor injuries were "very defensible." Doc. 41-5 at 71:22, 72:1–13. Indeed, she admits that "[Defendant] had identified [Plaintiff's] claim as Number 1." *Id.*

Because Defendant knew how severe Plaintiff's injuries were by the time it received Fariello's initial demand, Plaintiff argues that Defendant had a responsibility to accept the offer, as the offer represented an opportunity for Defendant to settle the most serious claim and avoid an excess judgment. The Court will consider these facts in its totality of the circumstances analysis.

### b) Multiple Claims Standard

The Court must also analyze Defendant's actions in light of the multiple claims against Eason. *See Farinas*, 850 So.2d at 560. As such, the Court considers whether Defendant fully investigated the claims, sought to settle as many claims as possible within the policy limits, used reasoned claim settlement to minimize the magnitude of possible excess judgments against Eason, and kept him informed. *Id.* at 560–561. Defendant contends that it met each of those criteria. Plaintiff disagrees.

There is evidence in the record which suggests that Defendant's investigation was incomplete. Although Defendant promptly opened an investigation upon receiving notice of the accident and obtained two recorded statements from Eason, much of its investigation relied upon information provided by other parties. There is

no indication from the record that Defendant sought medical records from the claimants themselves. Notably, Defendant did not ask for any medical records from Fariello upon receiving the initial demand. Nor does the record show any effort to request information regarding Zapolski's injuries. Instead, any information about his injuries seems to have come solely from Hartford's counsel. To that end, there is no indication that, going into the settlement conference—the purpose of which was to settle all claims, not investigate them—that Defendant had investigated the extent of Zapolski's injuries.

Further, the record lacks any indication that Defendant sought the police report from the accident. Nor does it show that Defendant interviewed Ortiz or Richardson, two of the other injured parties. Defendant, as the insurer entrusted with control over the handling of the claims, undertook few investigative efforts prior to the settlement conference. That distinguishes this case from those that Defendant cites, such as *Mesa*, where there was no clear indication as to which party was the most seriously injured and the insurer immediately hired an entity to investigate, adjust the claims, identify potential claimants, and assist those claimants in achieving a global settlement. 799 F.3d at 1358–1360.

Defendant was also obligated to seek to settle as many claims as possible within the Policy's limits. *Farinas,* 850 So.2d at 559. Defendant made some effort to do so by scheduling a global settlement conference and advising all claimants that the goal of the conference was to equitably distribute the Policy's proceeds, because the limits "may not be sufficient to fully compensate the parties." Doc. 35-15 at 1; Doc. 39 ¶21.

At the conference, Defendant's attorney announced that Defendant had $50,000 that it would tender on behalf of Eason and ATS.[3] Doc. 35-4 at 19. The claimants' attorneys then discussed their clients' respective injuries and claims. It was confirmed that Plaintiff had the most serious injuries, following by Jessica Hajipour, Josh Hajipour, and Zapolski. Doc. 35-4 at 17–18. Whalen advised Defendant of the severity of Plaintiff's injuries and asserted that her claim was worth even more than McCrary's. *Id.* A day after the conference, Defendant sent a $25,000 check with a proposed release to Fariello to settle Jessica Hajipour's claim, (Doc. 35-27 at 1), and a $25,000 check with a proposed release to Whalen to settle Plaintiff's claim, (Doc. 35-26 at 1). The Court will consider Defendant's attempts to settle as many claims as possible when evaluating bad faith under the totality of the circumstances.

Next, the Court must consider whether Defendant minimized the magnitude of possible excess judgments against Eason by "reasoned claim settlement." *Marsh*, 303 F. Supp. 2d at 1325. Plaintiff alleges in her amended complaint that Defendant failed to take timely and appropriate action to minimize the risk of Eason's exposure to an excess judgment. Doc. 31 ¶28. Defendant maintains that it pursued a reasoned "plan of action" by seeking to settle as many claims as possible within the Policy limits. Doc. 35 at 20. Plaintiff attacks this notion by asserting that accepting Fariello's December 20, 2006 demand would have clearly minimized the magnitude of the possible excess judgments because only Zapolski's minor injury claim would have remained. Doc. 41

---

[3] Defendant's decision to try and secure a release for ATS is a separate issue, discussed below.

at 15. Plaintiff also argues that a reasonable jury could find that Eason was harmed by Defendant's failure to settle the most serious claims against him, which in turn resulted from Defendant "improperly and wrongly determining that ATS was an insured which [Defendant] needed to protect." *Id.*

Defendant's decision to seek a release of claims against ATS is a key issue of contention, and Plaintiff's arguments that Defendant's decision to do so was not backed up by a reasonable investigation and was harmful to Eason are supported by some evidence. The settlement offer and proposed release that Defendant sent to Plaintiff clearly stated that it was made on behalf of Defendant, the Easons, and ATS, and would "release, acquit, and forever discharge" those three parties from "claims, actions, or causes of action that Plaintiff then had or might thereafter accrue on account of or arising in any way out of all known and unknown, foreseen and unforeseen, injuries and damages resulting or to result from the accident." Doc. 35-26 at 1. Thus, in exchange for payment, Plaintiff was asked to release Defendant, Eason, Eason's wife, and ATS from all future liability.

Ordinarily, the Court would examine the Policy to determine Defendant's basis for seeking a release of claims against ATS. Plaintiff argues that the Court must construe the Policy under Georgia law because the Policy "was issued for delivery to a Georgia insured." Doc. 41 at 11. However, as discussed further in the analysis of Plaintiff's motion for partial summary judgment, the rule of *lex loci contractus* dictates that the law of the jurisdiction where the contract was executed governs the parties' rights and liability in determining an issue of insurance coverage. *State Farm Mut. Auto.*

*Ins. Co. v. Roach*, 945 So.2d 1160, 1163 (Fla. 2006).  Here, no argument or analysis regarding the location of the insurance contract's execution is provided by either side. As such, the Court declines to interpret the Policy in accordance with a particular jurisdiction's laws.

Nonetheless, there is significant evidence in the record that casts doubt on Defendant's decision to defend ATS in this case and include it in the proposed release it sent to Plaintiff. Scott Jones, Defendant's corporate representative, testified that ATS was not a named insured under the Policy. Doc. 35-8 at 36:19–24. He stated that, despite ATS not being a named insured, Defendant saw ATS as a "potential insured" when it decided to afford coverage because Eason had been driving ATS's vehicle at the time of the accident. *Id.* at 18:4–11. He also testified that, because Eason was driving a "work vehicle," whether coverage would exist was unclear to Defendant. *Id.* at 35:1–9. Jones explained that, because Defendant was not sure if ATS owned the vehicle involved in the accident, it could not determine whether a provision of the Policy that provided liability coverage for a non-named insured would apply in this case. *Id.* at 36:1–18.

Jones confirmed that Defendant never made a specific coverage determination that ATS was a covered party under the Policy. Doc. 36-6 at 18:22–20:11, 19:1–4. Instead, it "made a coverage determination to afford coverage for the loss itself," and having made this determination, was not "going to [go] back and say, well, you're not covered. . ." *Id.* at 19:5–7. Jones said that Defendant was "going to try and cover everybody that [it] could." *Id.* at 19:7–8. Even though ATS was not a named insured,

he explained, if ATS was an entity that Defendant was going to "protect underneath the [P]olicy," then Defendant would "consider them an insured underneath the [P]olicy." Doc. 35-8 at 37:6–9. When asked why Defendant took the position that any settlement for the Policy's limits must include Eason and ATS, Jones explained that ATS had asked Defendant to be included on the release. Doc. 36-6 at 30:15–23. Jones testified that Defendant was "trying to get *all parties* out that [it] could." *Id.* at 31:1–7 (emphasis added).

There is ample evidence in the record indicating that Defendant treated ATS as an insured and sought to defend it against Plaintiff's claims. For example, Sinclair sent an Affidavit of Coverage to Jones on December 15, 2006, which lists ATS as an additional insured under Section I. Doc. 35-11 at 2. Further, Setchel advised in her January 4, 2007, letter regarding the global settlement conference that she was representing Eason and ATS. Doc. 35-22 at 2. ATS also received a letter that day from Defendant's retained attorneys stating that they would represent ATS at the global settlement conference. Doc. 36-2 at 1. The letter advised that Defendant would "secure releases from each claimant and mail copies to" ATS if it was "able to settle all pending claims" against ATS. *Id.* Jones testified that ATS's attorney responded to this letter demanding that Defendant's settlement strategy minimize the possible excess judgments against both ATS and Eason. Doc. 36-6 at 41:21–25, 42:1–23.

Jones' testimony also suggests that Defendant's decision to treat ATS as an insured may have resulted from a failure to investigate whether coverage existed. Doc. 36-6 at 35:1–12. Jones admitted that Defendant never made a coverage determination

whether ATS was an insured under the Policy, and, potentially relevant to such a coverage determination, that they lacked records demonstrating whether ATS owned the vehicle. *Id.* at 50:1–53:7. Defendant's reasoning was that it was "trying to get all parties out that [it] could." *Id.* at 31:1–7. Like the preceding analyses, the Court will consider these facts when evaluating the totality of the circumstances.

The Court next considers whether Defendant kept Eason informed of the claim resolution process. *Marsh*, 303 F. Supp. 2d at 1325. Generally, it did. Within one week of learning of the accident, Sinclair sent a certified letter to Eason that: (1) set forth the Policy's available limits; (2) advised that the claims would exceed the Policy's limits; (3) advised Eason of his right to seek legal counsel regarding any personal liability that may arise from the claims; (4) described the claims being presented by Plaintiff, McCrary, Zapolski, and the Hajipours; and (5) informed Eason that these claims against him could exceed Hartford's $1 million policy limits. Doc. 35-9. Sinclair then forwarded a copy of Fariello's initial demand to Eason six days after it was received, advised Eason that Defendant had retained the Law Office of James Pratt on Eason's behalf, and informed Eason that Hartford had settled with McCrary's estate for the $1 million policy limits. Doc. 35-14. A copy of Bloom's response letter, which requested an extension of time to coordinate the global settlement conference, was also sent to Eason. Doc. 35-16. Plaintiff does not point out any potential lapses in communication, and Eason also testified that Defendant provided him with competent counsel in the Underlying Action—despite him mentioning that he was unaware of certain events that were "going on behind the scenes." Doc. 35-2.

### c) Unwillingness to Settle Claim Against Eason

Defendant also argues that summary judgment is warranted because the undisputed facts demonstrate that Plaintiff was unwilling to settle her claim. Doc. 35 at 21–23. It is true that "the claimant's unwillingness to settle the claim is relevant to whether the insurer acted in bad faith under a totality of the circumstances and is a factor that must be considered." *Losat v. Geico Cas. Co.*, No. 8:10-cv-1564-EAK-TGW, 2011 WL 5834689, at *6 (M.D. Fla. Nov. 21, 2011) (Kovachevich, J.) "[A]lthough a bad faith claim derives from and emphasizes the duty of the insurer to the insured, the conduct of a claimant and the claimant's attorney is relevant to determining the 'realistic possibility of settlement.'" *Cardenas v. Geico Ins. Co.*, 760 F. Supp. 2d 1305, 1309 (M.D. Fla. 2011) (Merryday, J.) (quoting *Barry v. Geico Gen. Ins. Co.*, 938 So.2d 613, 618 (Fla. 4th DCA 2006)). Clearly, an insurer's failure to settle would not be the cause of a resulting excess judgment if the claimant was unwilling to settle. *Eads v. Allstate Indemnity Co.*, No. 14-CIV-61791-Bloom/Valle, 2016 WL 3944072, at *11 (S.D. Fla. Jan. 25, 2016).

As noted above, the first demand on Plaintiff's behalf came on December 20, 2006, in which Fariello demanded the $50,000 per occurrence limit to settle the claims of Plaintiff and the Hajipours. Doc. 26-2. Fariello indicated that he was unwilling to release ATS as part of this proposed settlement. Doc. 26-1 at 22. Not long after, Plaintiff fired Fariello and retained Whelan to represent her, who initially demanded that Defendant postpone the settlement conference until he was able to "adequately participate." Doc. 35-23 at 1. The settlement conference nonetheless proceeded, and

Whalen attended on Plaintiff's behalf. According to claim notes, Whalen demanded $25,000 from Defendant for Plaintiff's injuries in exchange for a release of Defendant alone, and not the Easons, ATS, or Hartford. Doc. 35-4 at 24. Defendant rejected this demand because ATS and Eason were not included in the release. *Id.*

Defendant tendered a $25,000 settlement check to Whalen via letter the next day. The letter conditioned the settlement "upon [Plaintiff] executing a mutually acceptable release of all claims and demands." Doc. 39 ¶25. Enclosed was a release stipulating that Plaintiff would release her claims against Defendant, the Easons, and ATS. Doc. 35-26. *Id.* Whalen testified that he did not specifically recall whether he communicated his concerns regarding the release. Doc. 35-25 at 35:7–11. He also stated that he did not believe he contacted Defendant to address the release's language or sent a letter in response. *Id.* at 41:11–13; 35:14–22. Whalen said that he understood Defendant's letter, check, and release to be a response to the "initial demand letter" and, because the terms differed from the "initial demand letter," he was not "sure that [he] did much of anything with it." *Id.* at 35:14–24. He further testified that a demand was made "specifically about releasing only Mr. Eason." Doc. 26-5 at 39:1–10. He claimed that he did not "really follow up with [Defendant] to get other offers" because Defendant "had not responded to the offer" and had rejected "the demand that was made." *Id.* When asked whether Plaintiff had been willing to settle against Eason within the Policy's $25,000 per person limit, Whalen testified that "there really wouldn't have been much of a choice, but [Defendant] never" tendered the policy limits just for Mr. Eason. *Id.* at 44:1–9.

In analyzing Defendant's motion for summary judgment, the Court must view the evidence and factual inferences in the light most favorable to Plaintiff—and having done so, a genuine issue of material fact exists as to whether Plaintiff was willing to settle. Whalen testified that he did not act on Defendant's settlement offer because it included entities and individuals in addition to Eason, including ATS. Doc. 26-5 at 19:19–20:8. He stated that the offer "was not in compliance with the demand that was made" because it was "conditioned upon [a] mutually acceptable release of all claims and demands, and the proposed release attached release[d] all claims and demands by everybody . . . ." *Id.* at 40:18–25. Indeed, the offer letter stated that the settlement was "conditioned upon [Plaintiff] executing a mutually acceptable release of *all claims and demands*," and provided a proposed release. Doc. 35-26 at 1 (emphasis added). Thus, there is evidence that Whalen objected to the settlement because it was conditioned upon a release of all claims and demands against ATS.

Defendant attempts to dodge this argument by focusing on the letter's description of the release as "proposed" and thus open to negotiation. Defendant points to Setchel's testimony that in response to such releases, the claimant's attorney "can respond, delete anything he or she wants to delete, add anything he or she wants to add, if there are additional stipulations or agreements, anything of that nature." Doc. 35-17 at 60:19–25, 61:1–7. Further, Sinclair testified that Whalen did not express his concerns about the release to her. Doc. 35-5 at 70:11–19. Defendant also highlights Sinclair's testimony that, had Whalen responded to this letter and expressed concerns

regarding the release's language, she would have "worked with him" to address his concerns. *Id.* at 70:20–25.

Although the Court is cognizant that Whalen did not propose a counteroffer limiting the release to Defendant and Eason, his testimony indicates that Plaintiff would have settled for a release of Eason and Defendant alone. Other evidence, such as the settlement conference notes, also supports Plaintiff's claim that Whalen objected to Defendant conditioning settlement upon a release of all claims and demands.[4] Doc. 35-4 at 24. Additionally, aside from highlighting the fact that Defendant simply reissued the check many times over the course of several years, Defendant fails to cite any of its own efforts to communicate with Whalen following the tender of the $25,000 and the proposed release to reach a settlement of the matter.

The Court disagrees with Defendant's assertion that this case is like those in which claimants or their attorneys repeatedly refuse to respond to the insurer's representatives. *See e.g.*, *Eads*, 2016 WL 3944072, at *2–3. Defendant, as the insurer,

---

[4] Defendant asserts that this testimony of Whalen is "self-serving" and cities to *Shin Crest PTE, Ltd. v. AIU Ins. Co.*, 368 F. App'x 14 (11th Cir. 2010), to argue impliedly that such testimony should be disregarded. Doc. 44 at 8. However, in *Shin Crest*, the court described the statement of the plaintiffs in the underlying action that they would have agreed to a global settlement with Shin Crest and another entity at mediation constituted a self-serving statement at odds with "*numerous* portions of the record" indicating their strategy to avoid pursuing a settlement with Shin Crest. 368 F. App'x at 15 (emphasis added). The court emphasized that, even accepting their assertion as true, their "uncommunicated state of mind" did not show that the insurer ever knew that it could settle their claims against Shin Crest and the other entity before executing the settlement agreement and that the underlying plaintiffs' communications conveyed the exact opposite impression. *Id.* at 16. Here, Defendant points only to the "proposed" nature of the release and Whalen's failure to object to Defendant's offer, rather than any communications by Whalen or Pratt to Defendant that evidenced a refusal to settle. Doc. 44 at 8.

"has the burden to show that there was no realistic possibility for settlement." *Barry v. GEICO Gen. Ins. Co.*, 938 So.2d 613, 617 (Fla. 4th DCA 2006). And "[a]ny question about the possible outcome of a settlement effort should be resolved in favor of the insured." *Powell v. Prudential Prop. & Cas. Ins. Co.*, 584 So.2d 12, 14 (Fla. 3d DCA 1991). Thus, viewing the evidence and the factual inferences in the light most favorable to Plaintiff, Defendant has failed to show that there was no realistic possibility for settlement.

### d)  Totality of the Circumstances

Ultimately, the question of whether an insured acted in bad faith is determined by evaluating the totality of the circumstances. *Berges*, 896 So.2d at 680. Under Florida common law, Defendant carries the "duty to [its] insureds to refrain from acting solely on the basis of [its] own interests in settlement." *State Farm Mut. Auto. Ins. Co. v. LaForet*, 658 So.2d 55, 58 (Fla. 1995). The Court is guided by the analysis from above and additional considerations relevant to insurers' obligations under Florida law, as set forth in *Boston Old Colony*, *Harvey*, and other cases. The Court is mindful that summary judgment can and should be granted for an insurer where the evidence establishes that no reasonable jury could find for the plaintiff. However, in this case, a reasonable jury could find that Defendant acted in bad faith.

At the outset, Defendant appears to have sought to settle as many claims as possible. Indeed, it immediately began an investigation of the claim, acted diligently to coordinate a global settlement conference, and ensured that Eason received updates throughout the claim process. However, in other areas, Defendant did not do as well.

First, Defendant's purported investigation of the claims relied heavily on materials from others. It did not itself seek critical pieces of evidence, such as the police report and medical records for claimants' injuries. Significantly, Defendant also failed to conduct substantial investigation into whether the Policy provided coverage for ATS before reaching a decision to treat ATS as an insured. And Defendant continued to treat ATS as such in written communications, at the settlement conference, and for purposes of its offer to Plaintiff. Additionally, there is evidence in the record to suggest that Plaintiff would have settled for a release of Eason alone. Such a settlement would clearly have been in Eason's interest, and it would have allowed him to avoid the $1 million excess judgment that resulted from Plaintiff's claims.

Thus, based on the totality of the circumstances, a reasonable jury could find that Defendant did not act with the same haste and precision as it would if it were in Eason's shoes in seeking to avoid an excess judgment, and that Defendant did not "use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So.2d at 785. Thus, given the totality of the circumstances and the existence of genuine issues of material fact, the question of bad faith, here, is for the jury to decide.

### e) Damages

Defendant's initial motion argued that it is also entitled to summary judgment because Plaintiff fails to establish the necessary element of damages. Doc. 35 at 23–25. Defendant's motion for summary judgment was originally granted on this

threshold issue—as the Court found that Plaintiff had not obtained an excess judgment or its functional equivalent, which is necessary to show damages. Doc. 93 at 9–10.

However, as noted in the procedural posture section of this order, the Eleventh Circuit has since clarified that consent judgments are excess judgments that can satisfy the causation requirement for a bad-faith claim. *McNamara*, 30 F.4th at 1060. It is now clear that a final judgment that exceeds all available insurance coverage, regardless of whether it results from a consensual settlement or a jury verdict, is an "excess judgment" under Florida law. *Id.* at 1058. A brief overview of the Stipulated Final Judgment in this case follows.

On August 25, 2016, Thompson, Eason's attorney, sent Defendant draft copies of the Stipulated Final Judgment and the Stipulation for Final Judgment. Docs. 35-34 at 1–6. Thompson described these documents as "the offer of Plaintiff to resolve this case short of a trial." *Id.* at 1. The copy of the Stipulated Final Judgment provided by Thompson to Defendant is identical to the court-executed copy of the same document, which Plaintiff provided. Docs. 31-3; 35-34 at 3–4. Neither party objects that these submitted copies are not representative of the final versions of the document. Docs. 35-34 at 5–6; 36-5 at 1–2.

Under the terms of the Stipulation for Final Judgment, Plaintiff and Eason agreed to settle the Underlying Action to "avoid the expense and uncertainties of a jury trial" and the entry of a judgment. Doc. 36-35 at 1. To that end, the Stipulation for Final Judgment provided that the settlement would resolve any claims by Plaintiff against Eason in the Underlying Action, except taxable costs and attorney's fees, and

the total amount of the stipulated settlement agreement would be $1 million. *Id.* The Stipulation for Final Judgment also provided that, prior to entering into the stipulation, Eason had "confirmed with" Defendant that he was "not violating the terms and conditions of" the Policy, "specifically the clauses involving voluntary assumption/payment and lack of cooperation." *Id.* at 2.

Execution of the Stipulation for Final Judgment did not assign any of Eason's rights, claims, or causes of action that Eason had against Defendant arising out of or related to the Underlying Action; Eason made such assignment in the Joint Stipulation and Agreement, executed by Plaintiff and Eason several years later. Doc. 31-4 at 2.

Plaintiff and Eason agreed to, and the state court entered, a Stipulated Final Judgment for $1 million. Doc. 39 ¶27. Pratt and Eason then entered into the Joint Stipulation and Agreement in 2018, in which Eason granted an assignment of certain rights, claims, actions, or causes of action that Eason had against Defendant which arose out of or were in any way related to the subject matter of the Underlying Action, Doc. 31-4 at 2. On these facts, the Court now examines whether there was an excess judgment or its functional equivalent in this case.

The Court first notes that Defendant's supplemental briefing did not argue that the facts of this case differ from *McNamara*. Doc. 117. As already explained, under Florida law, an excess judgment is a judgment against the insured that exceeds his insurance coverage. *McNamara*, 30 F.4th at 1059. Here, Eason accepted a proposal for settlement and the judge entered a final judgment in the underlying action for one million dollars, which significantly exceeded the policy limits of $25,000 per person

and $50,000 per claim. This final judgment thus qualifies as an excess judgment for the purposes of this bad faith suit. *Potter v. Progressive Am. Ins. Co.*, No. 21-11134, 2022 WL 2525721, at *2 (11th Cir. July 7, 2022); *McNamara*, 30 F.4th at 1059. Thus, Defendant is not entitled to summary judgment on this point.

Accordingly, for all the foregoing reasons, the Court will deny Defendant's motion for summary judgment.

### B. Plaintiff's Motion for Partial Summary Judgment

In moving for partial summary judgment, Plaintiff seeks several legal rulings. Specifically, Plaintiff asks the Court to find that: (1) ATS was not insured under the Policy; (2) Defendant's January 9, 2007, offer required that ATS be released; (3) a potential indemnification claim was not a basis for Defendant to attempt to settle the claims against ATS; and (4) the Stipulated Final Judgment is reasonable and enforceable against Defendant. Doc. 36 at 2. The Court will deny this motion, in part, and grant it, in part.

### i. Coverage for ATS Under the Policy

Plaintiff asks the Court to find that the Policy did not afford coverage to ATS. Doc. 36 at 2, 9. This request is due to be denied.

The rule of *lex loci contractus* "provides that the law of the jurisdiction where the contract was *executed* governs the rights and liabilities of the parties in determining an issue of insurance coverage." *Roach*, 945 So.2d at 1163 (emphasis added). The Florida Supreme Court has described this rule as an "inflexible rule." *Id.* at 1264 (internal

quotation marks omitted). "The determination of where a contract was executed is fact-intensive, and requires a determination of where the last act necessary to complete the contract was done." *Prime Ins. Syndicate, Inc. v. B.J. Handley Trucking, Inc.*, 363 F.3d 1089, 1092–93 (11th Cir. 2004). "The Eleventh Circuit has held that in the context of Florida's *lex loci contractus* rule that '[t]he last act necessary to complete a contract is the offeree's communication of acceptance to the offeror." *Pierce v. Prop. & Cas. Ins. Co. of Hartford*, 303 F. Supp. 3d 1302, 1305 (M.D. Fla. 2017) (Byron, J.) (alteration in original) (quoting *Prime Ins. Syndicate*, 363 F.3d at 1092–93). Similarly, "in the context of insurance contracts, courts have found that the last act necessary to create an insurance contract is an insurer's (or its agent's) communication of acceptance of the insured's (or its agent's) offer to purchase insurance." *Id.*

Plaintiff contends that the Policy must be "construed under Georgia insurance contract law" because the Policy "was issued for delivery to a Georgia insured." Doc. 36 at 9. On this basis, Plaintiff cites principles of contract interpretation under Georgia law to argue, in three sentences, that the Policy did not afford coverage to ATS because ATS owned the automobile involved in the accident. *Id.* However, Plaintiff's argument that Georgia law applies because the Policy "was issued for delivery to a Georgia insured" is incomplete, because the law of the jurisdiction where the contract was *executed* governs parties' rights and liabilities in determining an issue of insurance coverage. Plaintiff does not address, through argument, record citations, or otherwise, where the Policy was executed. While the parties agree that the Policy provided coverage to Eason and that Eason advised Sinclair that he lived in Georgia, these facts

do not demonstrate where the Policy was executed. Similarly, although a review of the Policy reveals a Georgia address for Eason and his wife, as the named insureds, this address does not show that the Policy was executed in Georgia. Doc. 31-1 at 1. The determination of where a contract was executed is a fact-intensive inquiry, yet Plaintiff fails to offer the facts necessary for the Court to make such a determination. As such, the Court declines to interpret the Policy in accordance with a particular jurisdiction's laws of interpretation in the absence of a determination of where the insurance contract was executed.

The Court will allow the parties to submit a stipulation regarding the place where the policy of insurance at issue was executed, if there is no dispute. Any such stipulation shall be submitted on or before April 14, 2023. Upon receipt of the stipulation, the Court will reconsider Plaintiff's motion for partial summary judgment as to whether ATS was insured under the policy.[5]

## ii. Offer Requiring a Release of ATS and Eason

Plaintiff next asks the Court to find that Defendant's January 9, 2007, offer requires a release of Eason and ATS. Doc. 36 at 10. Plaintiff argues that the offer's terms cannot be interpreted as offering to release Eason only and that the offer's use of "proposed" does not alter the conclusion that the offer included a release of ATS.

---

[5] The Court disagrees with Defendant that Plaintiff is requesting a declaratory judgment against Defendant on the issue of whether ATS was insured under the policy. Pursuant to Rule 56, Fed. R. Civ. P., a party may move for summary judgment on a part of each claim or defense. An issue for determination in this case is whether Defendant improperly determined that ATS was an insured party for which it should seek a release of claims.

*Id.* Plaintiff argues that whether the offer required a release of ATS is relevant to whether the offer was reasonable under the circumstances. Doc. 43 at 3.

In *Hayas v. GEICO General Insurance Company*, this Court was confronted with a similar determination. No. 8:13-cv-1432-VMC-AEP, 2014 WL 6883131, at *6 (M.D. Fla. Dec. 5, 2014) (Covington, J.). In that bad faith action, the plaintiff moved for partial summary judgment, seeking a determination from the Court that the insurer's initial response to an original time-limited settlement offer constituted a rejection of, and counteroffer to, the plaintiff. *Id.* The Court explained that, although the plaintiff's arguments were grounded in simple contract law, whether the insurer acted in accordance with its duty of good faith under the totality of the circumstances was the issue to be determined. *Id.* Because the action was a bad faith action and not simply a contract dispute, the Court denied the request. *Id.*

Here, similarly, Plaintiff's arguments are grounded in contract law. Doc. 36 at 10. However, the ultimate issue before the Court is whether Defendant acted in bad faith with regard to Eason's claims. As such, the Court must evaluate, under the totality of the circumstances, whether Defendant acted in bad faith. A decision on only one aspect of the totality of the circumstances test would not obviate the need for trial in accordance with the underlying purpose of Federal Rule of Civil Procedure 56. *See McPartland v. Gov't Emps. Ins. Co.*, No. 6:09-cv-268-MSS-GJK, 2010 WL 11507564, at *7 (M.D. Fla. May 19, 2010) (Scriven, J.).

Additionally, genuine issues of material fact exist as to whether Defendant's January 9, 2007 offer required that ATS be released. For example, Plaintiff urges that

38

the offer did since ATS was included in the release. Defendant contends that the release was a proposed release that could have been negotiated. Accordingly, this request is denied.

### iii.  Potential Indemnification Claim

Plaintiff next argues that undisputed evidence demonstrates that Defendant's efforts to defend ATS were not "based on any concern regarding a potential indemnification claim by ATS against Eason." Doc. 36 at 10. Specifically, Plaintiff asserts that Kathy Maus, Defendant's insurance claims expert, improperly opined that Defendant was correct to defend ATS based on a potential indemnity claim. *Id.* at 7– 8. To that end, Plaintiff asks the Court to find that "[a] potential indemnification claim was not a basis for [Defendant] to attempt to settle the claims against ATS." *Id.* at 3.

The Court presently declines to consider Maus' testimony because no effort has been made to address the foundation for its admissibility.[6] Although the Court is a gatekeeper to insure that speculative and unreliable opinions do not reach the jury, challenges to expert testimony are usually made in motions to exclude under *Daubert*[7] or during cross-examination at trial. To the extent that Plaintiff requests the Court find that Maus' opinion was wrong, this issue goes towards Maus' credibility, and Plaintiff

---

[6] "The burden for laying the proper foundation for admission of expert testimony is on the party offering the expert; admissibility must be shown by a preponderance of the evidence." *Chapman v. Procter & Gamble Distrib.,* LLC, 766 F.3d 1296, 1312–13 (11th Cir. 2014). As no effort has been made to address the foundation for the admissibility of Ms. Maus' testimony or, the testimony's admissibility more generally, the Court presently declines to consider such testimony.

[7] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)

may address the issue on cross-examination at trial. *Id.* at 11. Moreover, genuine issues of material fact exist as to whether a potential indemnification claim was the basis for Defendant's attempt to settle the claims against ATS. Accordingly, Plaintiff's request is denied.

### iv.  Reasonableness and Enforceability of Consent Judgment

Finally, Plaintiff asks the Court to make a determination that "the consent judgment is reasonable and enforceable" against Defendant. Doc. 36 at 2. Defendant responds that Plaintiff has not met the legal requirements for maintaining her action against GEICO because Florida law requires that Plaintiff obtain an excess judgment or its "functional equivalent" to establish a claim for damages caused by the alleged bad faith. Defendant's argument has been foreclosed by *McNamara v. GEICO*, 30 F. 4th 1055 (11th Cir. 2022), in which the Eleventh Circuit concluded that a stipulated judgment "would be a way to obtain an excess judgment that could be used in a bad faith lawsuit" against an insurer.[8] *Id.* at 1061-1062.  If this is the only basis for Defendant's Third Affirmative Defense, Plaintiff's motion for partial summary judgment on this affirmative defense is due to be granted.

However, if by its Third Affirmative Defense, Defendant contends that the amount of the stipulated judgment is unreasonable or the product of fraud or collision, that issue is for the jury to decide. The record reflects that Defendant is not a party to

---

[8] The Court notes that the initial briefing by the parties in this case concluded prior to the appellate court's opinion in *McNamara*. Although supplemental briefing was permitted, in light of *McNamara* and the appellate court's remand of this case, the parties did not further address this issue.

the judgment, as its policy limits were limited to $25,000 per person. *See* Doc. 31-3; Doc. 39 ¶ 27. Defendant expressly stated it was not agreeing that the stipulated judgment amount was reasonable. Doc. 35-35 at 1. But Defendant agreed that Eason's stipulation to damages did not violate the terms of the policy. A dispute exists as to whether Defendant agreed to the Stipulated Final Judgment. Because genuine issues of material fact exist as to the reasonableness of the amount of the stipulated judgment, Plaintiff's motion for partial summary judgment as to the Third Affirmative Defense based on the reasonableness of the amount of the judgment is due to be denied.

IV.    **CONCLUSION**

Accordingly, it is **ORDERED** as follows:

1.   Defendant's Motion for Final Summary Judgment, (Doc. 35), is **DENIED**.

2.   Plaintiff's Motion for Partial Summary Judgment and Incorporated Memorandum of Law, (Doc. 36), is **DENIED,** in part, and **GRANTED,** in part, as set forth in this Order. Plaintiff's motion is granted to the extent that by its Third Affirmative Defense, Defendant asserts that Plaintiff has not met the legal requirements for maintaining her action against Defendant.

3.   A final pretrial conference and trial term for this action will be scheduled by separate notice.

**DONE** and **ORDERED** in Tampa, Florida on March 31, 2023.

41

Charlene Edwards Honeywell
United States District Judge

Copies furnished to:

Counsel of Record
Unrepresented Parties